The CINCINNATI GAS & ELECTRIC COMPANY, et al., Plaintiffs,

v.

GENERAL ELECTRIC COMPANY, et al., Defendants.

No. C–1–84–988.

United States District Court,
S.D. Ohio, W.D.

Sept. 4, 1986.

Robert G. Stachler, Cincinnati, Ohio, for Cincinnati Gas & Elec. Co.

Stephen E. Koziar, Dayton, Ohio, for Dayton Power & Light Co.

Michael P. Graney, Simpson, Thatcher, & Bartlett, Columbus, Ohio, for Columbus & Southern Ohio Elec. Co.

Kenneth R. Logan, Robert Cusumano, Simpson, Thatcher & Bartlett, New York City, James N. Nowacki, James C. Munson, Chicago, Ill., for plaintiffs.

James R. Adams, Elizabeth K. Lanier, Cincinnati, Ohio, Wm. Bruce Hoff, Jr., William A. Gordon, John M. Carroll, Harley Hutchins, Chicago, Ill., for General Elec. Co.

Bruce M. Allman, Cincinnati, Ohio, for Sargent & Lundy Engineers; Mary Ellen Hogan, Walter M. Jones, Frank M. Covey, Jr., Chicago, Ill., of counsel.

**Table of Contents to Opinion and Order**

| | Page |
|---|---|
| General Electric's Motion Counts I through IX | 55 |
| A. Plaintiffs' Tort Claims Against General Electric—Counts III through IX | 55 |
| (1) Strict Liability | 56 |
| (2) Negligence | 60 |
| (3) Implied Warranty to Perform in a Safe and Workmanlike Manner | 61 |
| (4) Failure to Perform as an Expert | 61 |
| (5) Negligent Misrepresentation/Willful Wanton Misconduct | 62 |
| (6) Wrongful Inducement | 63 |
| B. Plaintiffs' Contract Claims Against General Electric | 64 |
| Sargent and Lundy's Motion— Counts X through XV | 66 |

**54**

| | | Page |
|---|---|---|
| A. | Plaintiffs' Tort Claims Against Sargent and Lundy | 66 |
| B. | Plaintiffs' Contract Claims Against Sargent and Lundy | 68 |
| | General Electric's Motion— | |
| | Counts XVI and XVII | 70 |
| A. | Fraud | 70 |
| B. | Racketeer Influenced and Corrupt Organizations Act | 74 |
| | (1) Acts of Racketeering Activity | 76 |
| | (2) Pattern of Racketeering Activity | 78 |
| | (3) Statute of Limitations | 80 |
| | (4) Sufficiency of Pleading a Violation of § 1962(a) | 82 |
| | (5) Sufficiency of Pleading a Violation of § 1962(b) | 84 |
| | (6) Sufficiency of Pleading a Violation of § 1962(c) | 86 |
| | Conclusion | 88 |

## OPINION AND ORDER

SPIEGEL, District Judge:

This matter came on for consideration of the motion to dismiss by defendant, Sargent and Lundy and its individual partners (doc. 80), motion for judgment on the pleadings by defendant General Electric Co. (doc. 81), plaintiff Cincinnati Gas and Electric Company's (CG & E) memorandum in opposition to defendant Sargent and Lundy's motion to dismiss (doc. 86), memorandum in opposition to defendant General Electric Company's motion for judgment on the pleadings (doc. 87), reply in support of motion for judgment on the pleadings by defendant General Electric Company (doc. 95), and the reply in support of motion to dismiss by defendants Sargent and Lundy and its individual partners (doc. 95). Plaintiffs have also submitted a motion to file a surreply (doc. 229) to which General Electric has responded (doc. 239). The object of that motion is to address additional points brought out by defendants in their reply. In the interests of justice, we grant plaintiffs' motion to file a surreply and will consider it herein.

This litigation arises out of the construction of the William H. Zimmer Nuclear Power Station (hereinafter the "Zimmer Plant") in Moscow, Ohio. In August 1969, defendant General Electric Company agreed, pursuant to a written contract to supply a nuclear reactor and related services including information concerning the magnitude and number of loads that would be generated by the nuclear steam supply system (hereinafter "NSSS"), to CG & E,

Dayton Power and Light Company, and Columbus and Southern Ohio Electric Company (hereinafter "the plaintiffs") for the proposed plant. The defendant, Sargent and Lundy, provided the architectural and engineering services for the plant and incorporated the information supplied by defendant General Electric into the design of the Zimmer Plant. Plaintiffs allege that the Zimmer containment is unable to withstand the violent forces generated by General Electric Company's NSSS or contain its radioactive steam. As a result, plaintiffs have expended millions of dollars in an effort to determine how to repair the Zimmer Plant and operate it safely.

Plaintiffs have sued General Electric and Sargent and Lundy on a variety of legal theories in both tort and contract. In plaintiff's second amended complaint, they also allege certain violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961 *et seq.* The second amended complaint is directed toward General Electric alone.

Article X of the contract between plaintiffs and defendant General Electric specifically limits liability "for all claims of any kind, including negligence, for any loss or damage arising out of, connected with, or resulting from this contract, or from the manufacture, sale, delivery, resale, installation or technical direction of installation, repair or use of any equipment covered by or furnished under the contract" to the contract price, which is $55 million.

To summarize what follows, in our view, CG & E has attempted to circumvent the

specific limitation on damages set forth in the contract by pleading numerous tort theories of recovery in Counts III through IX. Plaintiffs allege similar tort theories against Sargent and Lundy. We conclude that, since all of the parties entered into a written contract, the plaintiffs should be, for the most part, limited to such remedies that are available to them under contract law, and any tort remedies or tort claims arising out of those contracts should be dismissed. Therefore, as to Counts I through XV, this action will proceed upon plaintiffs' contract claims alone (Counts I, II, X, and XI).

We find that the second amended complaint (Counts XVI and XVII) is a different matter. Unlike the first amended complaint, which charges that General Electric should have disclosed important information that it should have known, akin to negligence, the second amended complaint alleges that General Electric actually knew certain facts and intentionally withheld and misrepresented those facts for the purpose of deceiving plaintiffs. These causes of action, if successfully litigated, would entitle plaintiffs to punitive damages, attorneys' fees, and treble damages, far in excess of the contract damages, as "[i]n an action to recover damages for a tort which involves the ingredients of fraud, malice, or insult, a jury may go beyond the role of mere compensation to the party aggrieved, and award exemplary or punitive damages." *Roberts v. Mason,* 10 Ohio St. 278 (1859). Therefore, this action will also proceed on plaintiffs' fraud (Count XVI) and RICO (Count XVII) claims.

### GENERAL ELECTRIC'S MOTION
### Counts I through IX

Counts one through nine of plaintiff's amended complaint raise several theories of recovery against General Electric Company because of problems that developed from the design and manufacture of the NSSS: Breach of contract and warranty (Counts I and II), strict liability (Count III), negligent misrepresentation (Count IV), willful and wanton misconduct (Count V), wrongful inducement (Count VI), negligence (Count VII), breach of implied warranty of safe and workmanlike construction (Count VIII), and failure to perform services as an expert (Count IX).

### A. Plaintiffs' Tort Claims Against General Electric—Counts III through IX

General Electric argues that Counts III through IX of plaintiffs' amended complaint should be dismissed because, although sounding in tort, such claims arise out of alleged breach of contractual duties and purely economic loss. Moreover, General Electric argues that privity of contract and the sophistication of the parties concerning nuclear matters does not necessitate this Court's application of tort law in this action as a matter of public policy. Although both parties have eloquently argued their position, and the law of Ohio on the subject of products liability and economic loss is unsettled, we agree that Counts III through IX should be dismissed.

Before we begin the difficult task of determining the types of losses for which Ohio law provides a remedy under the various tort theories of recovery and which claims presented in plaintiffs' amended complaint arise out of contract, we must address the threshold issue of what type of loss have plaintiffs suffered? Since there is no allegation of personal injury in this case, we confine our discussion to situations which involve economic loss or damage to the defective product itself. One commentator, attempting to shed light upon the murky distinction between property damage and pure economic loss, has noted:

> [W]hen the defect causes an accident 'involving some violence or collision with external objects,' the resulting loss is treated as property damage. On the other hand, when the damage to the product results from deterioration, internal breakage, or other non-accidental causes, it is treated as economic loss.

Note, *Economic Loss in Products Liability Jurisprudence,* 66 Colum.L.Rev. 917, 918 (1966).

In *Spring Motors Distributors, Inc. v. Ford Motor Company,* 98 N.J. 555, 489 A.2d 660 (1985), the Court concluded, con-

sistent with the above explanation, that the gravaman of plaintiff's complaint, seeking recovery for repair, towing, and replacement parts for transmissions installed in commercial trucks, as well as for lost profits and a decrease in the value of the trucks, was for economic loss.

A further distinction may be made between direct and indirect economic loss. Direct economic loss is the loss attributable to the decreased value of the product itself, measured by the difference between the actual value of the defective product and the value it would have had had it not been defective. *Mead Corp. v. Allendale Mutual Insurance Co.,* 465 F.Supp. 355, 363 (N.D.Ohio 1979). On the other hand, indirect economic loss is the consequential damage an owner of a defective product sustains, *Mead Corp., Id.* at 363, which includes damages for a loss in the bargain, as well as the cost of repair and replacement. *Spring Motors Distributors,* 98 N.J. at 561, 489 A.2d at 663.

> Generally speaking, tort principles, such as negligence, are better suited for resolving claims including unanticipated physical injury, particularly those arising out of an accident. Contract principles, on the other hand, are generally more appropriate for determining claims for consequential damage that the parties have, or could have, addressed in their agreement.

*Id.* at 579, 489 A.2d at 672.

The gravaman of plaintiffs' complaint in this case is that the defects in the Zimmer containment caused them to sustain costs for repair or costs to redesign and reconstruct the Zimmer Plant. Plaintiffs have not alleged any present personal injury or property damage. Nor do plaintiffs allege that any component parts, supplied by defendants, have caused any structural damage to other portions of the Zimmer Plant. Therefore, we conclude that the cost of repair or cost to redesign and reconstruct the Zimmer Plant is purely economic loss, and is more appropriately dealt with by applying traditional contract principles.

## (1) Strict Liability

Count III of the amended complaint seeks recovery on the basis of strict liability. Plaintiffs allege that the NSSS, including its components, its auxiliary systems and the nuclear containment, was dangerously defective and unsafe as designed, manufactured, sold and provided by General Electric and installed under General Electric's direction. Plaintiffs also allege that the engineering analysis, technical advice, designs, information, and other services provided by General Electric were dangerously defective, inaccurate, incomplete, inadequate and unsafe. As a result, plaintiffs have spent millions of dollars to redesign and reconstruct the Zimmer Plant.

Having concluded that the costs of redesigning and reconstructing the Zimmer Plant is economic loss, the second step in our analysis is to determine whether Ohio law allows recovery in strict liability under section 402A of the Restatement (Second) of Torts solely for economic loss sustained as a result of a defective product where the parties are in privity of contract. While no Ohio court has squarely addressed this issue, we conclude that section 402A is inapplicable in the action before us.

The genesis for strict liability in tort was the decision of *Greenman v. Yuba Power Products, Inc.,* 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1963) which held:

> The manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being ... [27 Cal.Rptr. at 700] 377 P.2d at 900.

Subsequent to the decision in *Greenman,* the doctrine of strict liability in tort was extended to actions arising out of property damages by the Court in *Seely v. White Motor Co.,* 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965), which held that "physical injury to property is so akin to personal injury that there is no reason for distinguishing them." Clearly, Ohio law recognizes a tort theory based upon strict liability if property damage exists. *Bradford Glycerine Co. v. St. Mary's Woolen Mfg.*

*Co.*, 60 Ohio St. 560, 54 N.E. 528 (1899); *Walczesky v. Hervitz*, 26 Ohio St.2d 146, 269 N.E.2d 844 (1971). However, plaintiffs urge this Court to go two steps further and apply the doctrine in situations where property damage or personal injury is non-existent and the cause of action arises out of contract. On the present state of the law in Ohio as it relates to strict liability, we decline plaintiffs' invitation.

The Ohio Supreme Court first addressed the issue of whether economic loss could be recovered in tort and the tort, contract dichotomy in *Inglis v. American Motors Corp.*, 3 Ohio St.2d 132, 209 N.E.2d 583 (1965). In recognizing a tort theory of recovery, for economic loss based upon breach of warranty where the parties were not in privity of contract, the Court in *Inglis* relied upon the court's reasoning in *Santor v. A & M Karagheusian, Inc.*, 82 N.J.Super. 319, 197 A.2d 589 (1964), *rev'd*, 44 N.J. 52, 207 A.2d 305 (1965):

> There is no doubt that the great mass of warranty cases imposing liability on the manufacturer regardless of lack of privity were concerned with personal injuries to the ultimate consumer. * * * [Citation of authorities]. But we see no just cause for recognition of the existence of an implied warranty of merchantibility and a right to recovery for breach thereof regardless of the lack of privity of the claimant in the one case and the exclusion of recovery in the other simply because loss of value of the article sold is the only damage resulting from the breach.
>
> The manufacturer is the father of the transaction. He makes the article and puts it in the channels of trade for sale to the public. No one questions the justice of a rule which holds him liable for defects arising out of the design or manufacture, or other causes while the product is under his control. After completion the article may pass through a series of hands, such as a distributor and a wholesaler, before reaching the dealer at the point of ultimate intended sale. The dealer is simply a way station, a conduit on its trip from manufacturer to consumer. For these reasons in the recent past the courts of many jurisdictions, in an endeavor to achieve justice for the ultimate consumer, have imposed an implied warranty of reasonable fitness on the person responsible for the existence of the article and the origin of the marketing process. From the standpoint of principle we perceive no sound reason why the implication of reasonable fitness should be attached to the transaction and be actionable against the manufacturer where the defectively made product has caused personal injury and not actionable when inadequate manufacture has put a worthless article in the hands of an innocent purchaser who has paid the required price for it ...

*Inglis*, 3 Ohio St.2d at 139–140, 209 N.E.2d 583 (citing *Santor*, 82 N.J.Super. at 322, 197 A.2d 589).

In a subsequent decision involving personal injury and a lack of privity of contract between the product manufacturer and injured party, the Court indicated that there are virtually no distinctions between Ohio's implied warranty tort theory and the Restatement version of strict liability in tort. *Temple v. Wean United*, 50 Ohio St.2d 317, 364 A.2d 267 (1977). Therefore, our analysis of the issues involved herein include the various authorities plaintiffs have cited to support their position which involve warranty, as well as strict liability theories.

From the outset, we point out that the foregoing cases involved a consumer who was not in privity with the product manufacturer or supplier and therefore, proof of negligence and other theories of recovery would be difficult at best. Plaintiffs have provided us with much authority that Ohio does permit recovery for economic loss under various tort theories. However, we find that a common ingredient in those cases is either property damage or the lack of privity of contract between the injured party and the product manufacturer.

In *United States Fidelity and Guaranty Co. v. Trust & Concrete Equipment Co.*, 21 Ohio St.2d 244, 257 N.E.2d 380 (1970), the Court confirmed the importance of privity to product liability actions in

Ohio. The insurer of a cement truck, not in privity of contract brought an action for economic loss against the defendant manufacturer. Only after determining that there was no contractual relationship between the parties did the Supreme Court characterize plaintiff's action as one in tort "based upon the breach of an implied warranty. . . ." *Id.* 257 N.E.2d at 384. Subsequently, the Court in *Iacono v. Anderson Concrete Corp.,* 42 Ohio St.2d 88, 326 N.E.2d 267 (1975) permitted plaintiff to recover in tort for the cost of repairing a defective concrete driveway, but again, there was no express contract between the parties. Moreover, the Court in *Iacono* characterized the injury as property damage in finding physical deterioration in the product itself. Therefore, the prerequisites of section 402A were clearly met.

The Court, in *Mead v. Allendale Mutual Insurance Co.,* 465 F. Supp. 355, applied the foregoing authorities and concluded that economic loss is compensable under Ohio law based upon a theory of strict tort liability. However, *Mead* fails to provide us with any more guidance on the issue before us than the Ohio precedents. Although *Mead* purports to permit recovery in strict tort liability for purely economic loss, that action involved property damage as well, manifesting itself in corrosion of the stream turbine supplied by the defendant manufacturer, causing the joints in the coils to separate and deteriorate. *Id.* at 358. We also note that while *Mead* is a closer case, in that it permitted tort recovery for economic loss, even though there was privity of contract, the contract therein specifically limited defendants' liability to repair or replacement of defective parts for a twelve-month period which had expired. Therefore, the remedy provided under the contract was grossly inadequate.

■ We are persuaded that the Ohio courts would not permit recovery under a strict liability theory for purely economic loss, in a case such as this, where the parties are in privity of contract and there is no property damage or personal injury. We base our decision today on that very narrow premise. The authorities cited above heavily relied upon the reasoning of the New Jersey Court in *Santor v. A & M Karagheusian,* 82 N.J.Super. 319, 197 A.2d 589, which recognized an implied warranty of merchantability and right to recovery from a breach thereof, regardless of the absence of privity. *Id.* at 322, 197 A.2d 589. That same court has most recently pronounced that "The considerations that give rise to strict liability do not obtain between commercial parties with comparable power." *Spring Motors Distributors, Inc. v. Ford Motor Co.,* 98 N.J. 555, 489 A.2d 660. The *Spring Motors* court was concerned that if a commercial party could recover in strict liability for economic loss, it would obtain a greater economic benefit then it had contractually bargained for. We find that reasoning persuasive in this case, and we share those same concerns.

We believe that Ohio law is in accord with the pronouncement of the New Jersey Court in *Spring Motors.* In that regard, we find the following statement by the Court in *Avenell v. Westinghouse Electric Corp.,* 41 Ohio App.2d 150, 324 N.E.2d 583 (1974) instructive. Concluding that plaintiff's theory of implied warranty in tort must fail, the Court stated:

> [The] purchaser . . . dealt at arm's length with the seller . . . and was free to negotiate the terms of the contract of sale. Implied warranty in tort is ordinarily applied where the purchaser is not in privity with the seller. Second, plaintiffs seek purely consequential damages in contrast to damages for injured persons or property. Third, the turbine generator is not an ordinary consumer product, but a specialized piece of equipment, familiar to both buyers and sellers.

*Id.* 324 N.E.2d at 589.

We are aware that *Avenell* has been criticized as resting "upon a tenuous and unarticulated, distinguishment of an earlier Ohio case law" and as pre-dating "the Ohio Supreme Courts' clear statement on the recovery of economic loss in *Iacono v. Anderson Concrete Corp.,* 42 Ohio St.2d 88, 326 N.E.2d 267 (1975)." *Mead,* 465 F.Supp. at 366 n. 17. However, as previously discussed, we do not believe that

*Iacono* mandates a different result than the one reached by us today, as that case involved a total absence of privity and the presence of property damage. Moreover, the *Avenell* decision has not been specifically overruled by the Ohio courts, and therefore, there is no indication that it is not the law today with respect to tort recovery for economic loss when the parties are in privity of contract. Until the Supreme Court of Ohio directly states that the reasoning of the *Avenell* court is no longer valid or that the doctrine of strict liability should be applied to permit recovery for purely economic loss, even though the parties dealt at arm's length and pursuant to contract, we are compelled to follow that court's analysis. Moreover, the recent cases from other jurisdictions which plaintiffs have cited,[1] do not convince us that Ohio would extend the doctrine of strict liability in order to permit recovery of economic loss where the parties are in privity of contract. Those cases either involve a total lack of privity or the presence of property damage or personal injury. We also have the benefit of the recent Supreme Court opinion in *East River Steamship Corp. v. Transamerica Delaval, Inc.,* — U.S. ——, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) which held that whether stated in negligence or strict liability, no products liability claim lies in admiralty when a commercial party alleges injury only to a product resulting in purely economic loss. Therefore, on the present state of the law, we conclude that plaintiffs' claim founded upon section 402A must fail.

Finally, plaintiffs argue that the design and construction of a nuclear power plant is an ultra-hazardous activity which gives rise to strict liability and the imposition of extracontractual duties upon product manufacturers. Therefore, they contend that liability should be imposed upon defendant. Plaintiffs are correct in pointing out that the business of nuclear energy has been held to be "an intrinsically ultrahazardous activity." *Carolina Environmental Study Group v. United States,* 431 F.Supp. 203, 223 (W.D.N.C.1977), *rev'd on other grounds,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). *See also Silkwood v. Kerr-McGee Corp.,* 667 F.2d 908 (10th Cir.1981), *rev'd on other grounds,* 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). We would have little difficulty in applying the doctrine in the event of a nuclear catastrophe. However, we decline to impose such liability where the mere prospect of such a catastrophe is alleged. More important, we reach this conclusion because the present harm plaintiffs seek to remedy is economic loss. Strict liability for the ultrahazardous activities is specifically "limited to the kind of harm, the possibility of which makes the activity abnormally dangerous." Restatement (Second) of Torts § 519(2) (1977).[2]

We conclude that an example of the kind of harm justifying the imposition of strict liability is a nuclear explosion resulting in contamination of people and property, rather than economic loss sustained by the entity for which a nuclear power plant is built. The former type of harm is not alleged

**1.** *Philadelphia National Bank v. Dow Chemical Co.,* 605 F.Supp. 60 (E.D.Pa.1985) (parties were in privity of contract, but the defective product caused damage to other property. Therefore, § 402A of the Restatement (Second) of Torts was directly applicable); *School District of Lancaster v. Asarco,* slip op. Nos. 1414, 1415 (Pa.Ct. Common Pleas, Dec. 6, 1983) (absence of privity and the fact that the defect presented a real, unspeculative health hazard and that additional property had been damaged was determinative); *People Express Airlines, Inc. v. Consolidated Rail Corporation,* 100 N.J. 246, 495 A.2d 107 (1985) (involved economic loss, but there was also an absence of privity of contract).

**2.** For example, the thing that makes the storage of dynamite in a city abnormally dangerous is

the risk of harm to those in the vicinity if it should explode. If an explosion occurs and does harm to persons, land or chattels in the vicinity, the rule stated in Subsection (1) applies. If, however, there is no explosion and for some unexplained reason a part of the wall of the magazine in which the dynamite is stored falls upon a pedestrian on the highway upon which the magazine abuts, the rule stated in Subsection (1) has no application. In this case the liability, if any, will be dependent upon proof of negligence in the construction or maintenance of the wall.

Restatement (Second) or Torts § 519(2) comment e.

here and we decline to extend the doctrine any further.

Accordingly, Count III of the complaint should be dismissed.

### (2) Negligence

Count VII of the amended complaint seeks recovery on the basis of negligence. Plaintiffs allege that "as designor and advisor in connection with the provision of the BWR–5 NSSS for the Zimmer Plant, General Electric owed a duty of reasonable care to the owners in the performance of services for the owners." We conclude that since there is a written contract between sophisticated parties and plaintiffs seek recovery for economic loss alone, plaintiffs are limited to such remedies that are available under contract law.

In *Inglis v. American Motors Corp.*, 3 Ohio St.2d 132, 209 N.E.2d 583, the Court affirmed dismissal of an automobile owner's negligence claim which alleged that certain defects in the automobile, resulting from defendant's negligence, proximately caused him a loss of $1,500, the difference between the purchase price and the alleged market value of the automobile. The Court noted that "[p]laintiff does not allege that the negligence caused any damage to his person or to any property he owns other than that the auto is not worth what he paid for it." *Id.* at 140, 209 N.E.2d 583. In concluding that purely economic loss is not compensable in negligence, the Court quoted Dean Prosser who has stated:

'The one kind of damage not included is pecuniary loss. In other words, loss of the benefit of the bargain. If somebody sells an automobile to a dealer and the dealer sells it to the plaintiff, and it turns out that it is just no good as an automobile, so that having paid let us say $3,000 for the car, the plaintiff has received $1,500 loss, that kind of pecuniary loss is still, so far as I can see, limited to contracts between the parties, and the usual rule that for negligence there is no liability for mere pecuniary loss of a bargain, that is apparently carried over into this new tort, if that's the name for it.' *Cleveland Bar Association Journal*, 174–175, May 1965. *Id.*

In addition to clear Ohio law which holds that economic loss cannot be recovered in a product liability suit on a negligence theory, *see Mead Corp. v. Allendale Mutual Insurance Company*, 465 F.Supp. 355, we are persuaded by Judge Urbom's opinion in *Nebraska Public Power District v. General Electric*, No. CV75–L–142 (D.Neb. June 29, 1979), which addresses the precise issue before this Court. Specifically, should tort recovery for economic loss be permitted in a case involving sophisticated corporate entities, dealing in the specialized area of nuclear energy, who have entered into an extremely complex contract? In *Nebraska Public Power District*, the plaintiff sought recovery on the basis of strict liability and negligence for the designing, manufacturing, furnishing and installing of a defective bypass system in a nuclear facility. Plaintiff alleged it was forced to purchase power elsewhere, lose net revenues, and expend funds to replace the system, much like the plaintiffs here, who allege that they have expended millions of dollars for repair and replacement. The Court characterized the loss as "economic" loss. In holding that tort remedies were inapplicable, the Court stated:

With manufacturers of mass-produced chattels or other similarly situated business parties, on the one hand, there is often no bargained-for contract between the parties to specify in detail their rights and duties, but rather there is an implicit understanding that the product which the lay consumer buys will be safe and operate as expected. To protect these expectations and promote the safety of the lay public and its property, the law imposes a duty upon the manufacturer which sounds in tort. The contracts in these instances are generally boiler-plates, and do not affect consumer expectations. Thus, circumstances generate a broader duty, and the aggrieved party may sue in tort or contract.

In the case at bar, both parties to the contract were sophisticated businesses. The contract in elaborate detail sets out the rights and duties of the parties. The allegation of negligence stems from an

alleged failure to comply with the specifics to the contract. The alleged negligence could not be shown without pleading, establishing and relying on the intricacies of the contract.... *See Lincoln Carpet Mills v. Singer Company*, 549 F.2d 80, 82–83 (C.A. 8th Cir.1977).

NPPD contends that there exists a common law duty to perform contract duties with skill and in a workmanlike manner, the breach of which creates a cause of action in negligence. This argument was rejected by the court in *Fuchs [v. Parsons Const. Co.]*, 166 Neb. [188] at 197, 199, 201, 88 N.W.2d [648] at 653–654, 655–656 [1958]. While the alleged breach of contract in this case may be considered a breach of this common law duty, that breach of duty is not, on these facts, independent of the duties imposed by the contract. The factual issues pertain, then, to NPPD's cause of action for breach of contract.

■ Similarly, we conclude that plaintiffs' claims, based upon negligence, must be dismissed as the parties to the contract were sophisticated and the allegation of negligence stems from the breach of that contract. "When the promissee's injury consists merely of the loss of his bargain, no tort claim arises because the duty of the promisor to fulfill the term of the bargain arises only from the contract." *Battista v. Lebanon Trotting Association*, 538 F.2d 111, 117 (6th Cir.1976).

### (3) Implied Warranty to Perform in a Safe and Workmanlike Manner

■ Like the plaintiff in *Nebraska Power*, the plaintiffs herein also allege, in Count VIII of the amended complaint, that defendant owed a legal duty to plaintiffs, independent of the contract, to perform its contractual duties in a safe and workmanlike manner. While Ohio law is clear that a builder has a duty to perform with workmanlike skill and use proper materials, *Mitchem v. Johnson*, 7 Ohio St.2d 66, 218 N.E.2d 594 (1966), that duty may be found to have arisen out of the contract. *Tibbs v. National Homes Construction Corp.*, 52 Ohio App.2d 281, 369 N.E.2d 1218 (1977);

*Lloyd v. William Fannin Builders, Inc.*, 40 Ohio App.2d 507, 320 N.E.2d 738 (1973). In *First Bank of Akron v. Cann*, 503 F.Supp. 419 (N.D.Ohio 1980), *aff'd on other grounds*, 669 F.2d 415 (6th Cir.1982), the Court held that plaintiffs' allegation that the defendant "wrongfully failed to discover certain variances" was, in essence, a claim that defendant had failed to perform its services in a workmanlike manner and that "this implied warranty theory, improperly asserted as a tort claim, is co-extensive with [plaintiffs'] claim that [defendants] breached its express warranty that the project would be completed in a good workmanlike manner, and to consider it here [as a separate tort claim] would be superfluous." *Id.* at 440. Our review of plaintiffs' extensive amended complaint leads us to conclude that Count VIII reiterates plaintiffs' breach of contract and warranty claims, as the essence of both counts is the allegation that defendant performed faulty construction and design and failed to discover and disclose certain hydrodynamic loads. "Under Ohio law, the existence of a contract action generally excludes the opportunity to present the same case as a tort claim." *Wolfe v. Continental Casualty Company*, 647 F.2d 705, 710 (6th Cir.1981), *cert. denied*, 454 U.S. 1053, 102 S.Ct. 597, 70 L.Ed.2d 588 (1981). Without reaching the issue of whether the implied warranty of performance in a safe and workmanlike manner is limited to the builder-vendor situation, or whether General Electric may be so defined, we conclude that Count VIII, alleging that defendant failed to perform in a safe and workmanlike manner, should be dismissed for the foregoing reasons.

### (4) Failure to Perform as an Expert

■ We also conclude that Count IX, which alleges that defendant failed to perform services as an expert has its genesis in negligence theory, and for the foregoing reasons, should be dismissed. Ohio law is clear that:

A standard of conduct as to what constitutes ·due care may be established by legislative enactment or judicial decision. In the absence of either, it is established by a consideration of the facts and cir-

cumstances of the particular case. *Richard v. Staehle,* 70 Ohio App.2d 93 [434 N.E.2d 1379] (1980) *(citing Eisenhuth v. Moneyhon,* 161 Ohio St. 367 [119 N.E.2d 440] (1954).

Our research of Ohio law has failed to uncover a separate duty of care for experts, imposed by the Ohio courts or legislature which creates a cause of action distinct from a claim in negligence. The only statute, tangentially relevant, is Ohio Rev. Code § 2305.11(A) which provides:

An action for ... malpractice, including an action for malpractice against a physician, podiatrist, hospital, or dentist ... shall be brought within one year after the cause thereof accrues....

In *Hocking Conservancy District v. Dodson-Lindblom Associates, Inc.,* 62 Ohio St.2d 195, 404 N.E.2d 164 (1980), the Ohio Supreme Court declined to apply the statute to the profession of engineering and noted that although the term malpractice is sometimes used loosely to refer to the negligence of a member of any professional group, legally and technically, the term is still subject to the limited common law definition, which only included members of the medical and legal profession. Therefore, we conclude that the Ohio malpractice statute, Ohio Rev.Code § 2305.-11(A) is inapplicable in this case.

If there is no specifically defined standard of care, the Ohio courts apply the general principles of the Restatement (Second) of Torts § 299A, which provides:

'Unless he represents that he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities.' This standard has been applied to professionals in general. *Richard v. Staehle,* 70 Ohio App.2d at 124, 434 N.E.2d 1379.

We view the standard of care in this case, in the absence of special legislation or judicial decision, to be the care ordinarily used by members of the power generating profession and, in particular, the nuclear energy field. While the duty of care required may vary with the circumstances, one of which is the expertise possessed by an individual, the breach of that duty is merely an essential element of negligence law. Therefore, we conclude that the failure to perform as an expert does not constitute a theory of recovery independent of an underlying negligence claim. We have previously determined that plaintiffs' negligence claim should be dismissed. Accordingly, Count IX of the amended complaint should be dismissed.

**(5) Negligent Misrepresentation/Willful and Wanton Misconduct**

■ Count IV of the amended complaint which alleges negligent misrepresentation, is subject to the same analysis we applied to plaintiffs' negligence claims, as misconception of fact or law may be negligent conduct, Restatement (Second) of Torts § 304, and we conclude that is precisely what plaintiffs have alleged here. Accordingly, Count IV of the amended complaint is dismissed.

■ However, we depart from our previous analysis, as it pertains to plaintiffs' negligence claims, in considering Count V of plaintiffs' amended complaint, which alleges that "as a direct, proximate and foreseeable result of General Electric's willful and wanton misconduct, the owners were forced to incur costs of more than $360 million to redesign and reconstruct the Zimmer Plant...." Under Ohio law, an action based upon willful or wanton misconduct is distinct from an action for negligent conduct, as an essential element of such a claim is that the tortfeasor must act, or refrain from acting, with knowledge of a dangerous situation likely to cause injury to others. *Kellerman v. J.J. Durig Co.,* 176 Ohio St. 320, 199 N.E.2d 562 (1964). The essence of Count V is that General Electric willfully and wantonly supplied faulty information and testing and failed to properly investigate and make certain disclosures.

■ However, we conclude that plaintiffs have not stated a claim for willful and wanton misconduct, as a separate cause of

action, apart from plaintiffs' breach of contract claims. Punitive damages are not appropriate to and may not be awarded in an action for breach of contract and a pleader does not alter what is essentially an action for breach of contract by adding the words willfully, wantonly, and maliciously to a claim. *Ketcham v. Miller,* 104 Ohio St. 372, 136 N.E. 145 (1922). *See also Tibbs v. National Homes Construction Corp.,* 52 Ohio App.2d 281, 369 N.E.2d 1218. Moreover, where an action rises out of a contract, and is also based upon tortious conduct, "actual damages attributable to the wrongful acts of the alleged tortfeasor must be shown in addition to those damages attributable solely to the breach of the contract." *Ali v. Jefferson Insurance Company,* 5 Ohio App.3d 105, 108, 449 N.E.2d 495 (1982). In addition, there must be a breach of a legal duty imposed by law because of the relationship of the parties. For example, punitive damages in tort have been imposed upon insurance companies for their willful refusal to pay a valid claim pursuant to contract, based upon an implied-in-law duty of good faith and fair dealing. *See Hoskins v. Aetna Life Insurance Company,* 6 Ohio St.3d 272, 452 N.E.2d 1315 (1983); *Kirk v. Safeco Ins. Co.,* 28 Ohio Misc. 44, 273 N.E.2d 919 (C.P.1970). Our parent circuit has noted that "the special conditions existent in a consumer-held insurance contract do not apply to an ordinary contract between businessmen" and has reaffirmed the rule that "no punitive damages are available for breach of contract." *Battista v. Lebanon Trotting Association,* 538 F.2d at 118. As the Court noted in *Wolfe v. Continental Casualty Company,* 647 F.2d 705:

> The still valid rule of *Ketcham v. Miller,* 104 Ohio St. 372, 136 N.E. 145 (1922), forbids parties to convert contract actions into tort actions by attacking the motives of a breaching party, as the motive of a breaching party is irrelevant to a contract action ... [U]nder Ohio law the existence of a contract action generally excludes the opportunity to present the same case as a tort claim.

*Id.* at 710.

In Count II of the amended complaint, plaintiffs allege that "[b]ecause of GE's breaches of contract and warranties, the owners were required to incur costs of over $360 million to redesign and reconstruct the Zimmer Plant." Similarly, Count V of plaintiffs' amended complaint alleges that "as a direct, proximate and foreseeable result of General Electric's willful and wanton misconduct, the Owners were forced to incur costs of more than $360 million to redesign and reconstruct the Zimmer Plant." We conclude that these damages are attributable solely to the breach of the contract, and therefore, tort remedies for willful and wanton misconduct are unavailable. Moreover, the policy for finding a special relationship is not present in this case where the parties to the contract were sophisticated.

Furthermore, we note that Count XVI of plaintiffs' second amended complaint alleges that "[b]ecause of General Electric's willful and wanton misconduct in fraudulently inducing the owners to rely on its fraudulent representations and omissions, plaintiffs ... are entitled to recover punitive damages together with attorney's fees...." To a great extent, plaintiffs' claim for willful and wanton misconduct is incorporated in Count XVI of plaintiffs' second amended complaint, and accordingly, we dismiss Count V as a separate cause of action.

### (6) Wrongful Inducement

Count VI of the amended complaint alleges that plaintiffs were wrongfully induced to enter into the contract in that:

> GE knew or should have known at the time the NSSS was first put on the market that severe hydrodynamic loads would occur in the Mark II containment during certain operating and accident conditions. GE marketed and sold to the owners its NSSS without regard for the hydrodynamic loads which it knew or should have known would be generated, and failed to disclose to the Owners as prospective purchasers that those loads should be expected.... Consequently, ... the Owners were induced to contract for and purchase GE's boiling water

NSSS and the Mark II containment concept.

Again, defendants maintain that plaintiffs' claim for wrongful inducement is really a claim founded upon negligence, as can be gleaned from the language of Count VI, regardless of its title.

■ If Count VI is indeed a claim founded upon negligence, as defendant maintains, we must dismiss that Count because the economic loss plaintiffs seek is not compensable. *Inglis v. American Motor Corp.*, 3 Ohio St.2d at 132, 209 N.E.2d 583. Alternatively, if plaintiffs claim for wrongful inducement states more than a mere claim for negligence, arising outside of the limitations imposed by contract law, we see no reason to sustain this claim apart from plaintiffs' claim for fraudulent inducement delineated in Count XVI of the second amended complaint. For these reasons, we conclude that Count VI should be dismissed.

## B. Plaintiffs' Contract Claims Against General Electric

Plaintiffs assert two claims against General Electric for breach of contract and warranties. Count I seeks rescission and restitution. Count II is an action for damages. General Electric asserts that it is entitled to judgment on both counts because plaintiffs failed to plead notice to General Electric of a breach of the contract and plaintiffs have waived any right to rescission.

General Electric argues that, under Ohio law, notice of a breach of contract is a condition precedent to a defendant's liability, *Hutchinson v. Renner*, 28 Ohio App. 22, 162 N.E. 451 (1928) and that it is not sufficient that the seller was given notice of the facts constituting a nonconforming tender. He must also be informed that the buyer considers him to be in breach of the contract. *Roth Steel Products v. Sharon Steel Corp.*, 705 F.2d 134, 152 (6th Cir. 1983). On the other hand, plaintiffs argue that absent a specific requirement in a contract or statutory provision, the law does not require a plaintiff to allege that it has given notice of breach prior to the institution of a lawsuit. *See* Ohio Jur.3d *Contracts*, § 209 (1980). Plaintiffs point out that there is no clause requiring such notice in any of the contracts referred to in the complaint and that the notice requirement is statutorily imposed by Ohio Rev. Code § 1302.65(C) [3] which deals exclusively with the sale of goods. Therefore, plaintiffs contend that they were not required to give notice of the breach.

We agree that Ohio Rev.Code Chapter 1302 applies only to transactions for the sale of goods and that the contract involved herein was for services as well.

‘Goods’ means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities, and things in action. ‘Goods’ also includes the unborn young of animals and crops and other identified things attached to realty as described in Sec. 1302.02 of the Revised Code.

Ohio Rev.Code § 1302.01(A)(8).

In construing this section of the Ohio Code, this Court has the benefit of the Ohio decision of *Allied Industrial Service Corp. v. Kasle Iron & Metals, Inc.*, 62 Ohio App.2d 144, 405 N.E.2d 307 (1977) which set forth the test for determining whether the breach of a hybrid service-sales contract is actionable under the Uniform Commercial Code.

[T]he test for the inclusion in or the exclusion from sales provisions is whether the predominant factor and purpose of the contract is the rendition of service, with goods incidentally involved, ... *Id.* at 147, 405 N.E.2d 307.

The defendant in *Allied Industrial Service Corp.*, was hired to design an anti-pollution system and install the appropriate equipment into plaintiffs' scrap iron processing plant. Concluding that the defend-

---

**3.** Ohio Rev.Code § 1302.65(C) provides:
Where a tender has been accepted: (1) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy; ...

ant was not a seller of "goods" as that term is defined in Ohio Rev.Code § 1302.-01(A)(8), the Court noted:

> Allied's business was to design, install and service pollution control systems. Pursuant to an agreement with Kasle, Allied analyzed Kasle's pollution problem, proposed what equipment should be used and how it should be incorporated in a system to control that problem, ordered the equipment and installed it. In effect, Allied sold Kasle a combination of goods and services for a total nonitemized price of approximately $60,000.... In applying the predominant factor test, we find that Allied was selling its services in the design and installation of a pollution control system, and that the goods ordered and installed, *i.e.*, the particular filters, duct work, hood, etc., were incidental to the labor....

*Id.*

■ Moreover, in *Deaconess Home Ass'n v. Turner Construction Co.*, 14 Ohio App.3d 281, 286, 470 N.E.2d 950 (1984), the Court held that materials incorporated into a structure were not sold to plaintiff as "goods," but were incorporated in an improvement to plaintiffs' real estate in accordance with the construction contract. Therefore, the sales provisions of Ohio Rev.Code Chapter 1302 were inapplicable.

In this case, plaintiffs' own complaint reveals the importance of the services aspect of the contract, as plaintiffs stress the design aspects of General Electric's undertaking and faulty disclosure or non-disclosure of loads that would be generated by the NSSS. But, in addition, a large part of the contract concerns the provision of the nuclear reactor itself. We cannot say whether the sale or service aspect predominates in this case. However, such a determination is not necessary to our analysis, as we conclude that the policy reasons which underlie the notice requirement would not be satisfied in this case.

Those policies are as follows:

> First, express notice opens the way for settlement through negotiation between the parties. Second, proper notice minimizes the possibility of prejudice to the seller by giving him 'ample opportunity to cure the defect, inspect the goods, investigate the claim or do whatever may be necessary to properly defend himself or minimize his damages while the facts are fresh in the minds of the parties.'

*Standard Alliance Ind. v. Black Clawson Co.*, 587 F.2d 813, 826 (6th Cir.1978) (citations omitted).

■ We conclude that given the complexity of the contract and services provided in this case, and the long standing relationship of the parties, the purposes of imposing the requirement of notice of a breach are not satisfied in this case. The Zimmer contract was in the process of negotiation for approximately four years, between 1970 and 1974. By 1974, the Zimmer Plant design was nearly complete and construction of the plant was well underway. Over a period of the next six years, General Electric made certain disclosures concerning hydrodynamic loading conditions and their effects upon the structural components of the plant. Work on the Zimmer Plant continued until January 21, 1984, when the owners decided to endeavor to convert the Zimmer Plant from a nuclear project to a coal-fire plant. Plaintiffs allege that "throughout the period from 1974 until the conversion decision, General Electric and S & L [Sargent & Lundy] improperly assured the owners that all of the problems could readily be resolved and were not due to any fault on their parts and the owners were forced to rely on those representations." The facts reveal that both parties invested a great deal of time and effort in attempting to remedy the problems at the Zimmer Plant, that alternative suppliers in the technical nuclear power field were very limited, and that curing the defects would involve much more than simply replacing the defective product, because largely what rendered the product defective was the inaccuracy and unreliability of design information. We agree with plaintiffs that neither a simple tender nor acceptance as contemplated by the framers of Ohio Rev.Code Chapter 1302, was involved in this case and the notice requirement would have done little

to foster settlement or cure efforts. Moreover, we fail to see how General Electric has been prejudiced by the delay.

Therefore, we conclude that plaintiffs had no contractual or statutory duty to provide notice of breach to General Electric and we decline to dismiss Count I and II of the amended complaint on that basis.

■■■ For similar reasons, we decline to dismiss Count I on the basis of General Electric's additional argument that plaintiffs have waived any rights to rescission. Delay on the part of an injured party in exercising his right to rescind is not a waiver if it is caused by the pendency of repair efforts or assurances of repair. *Twin Lakes Land & Water Co. v. Dohner*, 242 F. 399 (6th Cir.1917). Moreover, "a lapse of time which would be unreasonable in one case may be entirely reasonable in another, and an important consideration in determining the question of unreasonable delay is whether there has been a change of position by, or prejudice to" the party who has breached the contract. 17A C.J.S. Contracts § 432, pp. 534–535. Ordinarily, the question of what is a reasonable time for rescission is a question of fact for the jury. *See Ryan v. Glenn*, 344 F.Supp. 198 (N.D.Miss.1972), *aff'd*, 489 F.2d 110 (5th Cir.1974); *Zelinger v. Uvalde Rock Asphalt Co.*, 316 F.2d 47 (10th Cir.1963). In this case, the negotiation of the Zimmer contract and its implementation, including General Electric's efforts to resolve any problems relating to the NSSS, took almost a decade and one-half. Those efforts apparently did not cease until January, 1984. Plaintiffs' initial complaint, setting forth a claim for rescission, was filed July 10, 1984 (*see* doc. 1). We refuse to find, as a matter of law that a six-month delay, or even a three-year delay as General Electric contends, given the Nature of the transaction, was unreasonable. Accordingly, defendants' motion as it relates to Count I and II is denied.

## SARGENT AND LUNDY'S MOTION
### Counts X through XV

Counts ten through fifteen of plaintiffs' amended complaint raise similar theories of recovery against Sargent and Lundy for failing to properly design the Zimmer containment: Rescission and restitution based on breach of contract (Count X), Damages for breach of contract (Count XI), Strict liability (Count XII), Negligent misrepresentation (Count (XIII), Professional malpractice (Count XIV) and Willful and wanton misconduct (Count XV).

### A. Plaintiffs' Tort Claims Against Sargent and Lundy

The same analysis that was applied to plaintiffs' strict liability claim against General Electric (Count III) is applicable to plaintiffs' strict liability claims against Sargent and Lundy (Count XII). Moreover, we conclude that Count XII should be dismissed for the additional reason that the contract between the parties merely provided that Sargent and Lundy would provide design services for the Zimmer Plant, as an architect and engineer. The doctrine of strict liability is primarily intended to impose special liability on those who market defective products to the general public in a mass-production context. *See* Restatement (Second) of Torts § 402A Comment C and F (1965). Even if the Sargent and Lundy "design" could somehow be construed as a product for purposes of section 402A, the design was specially tailored to the Zimmer Plant and was not mass-produced.

■■■ At the outset, we note that Ohio law provides us with little guidance as to whether section 402A applies to a situation where the rendition of services predominates over the sale of a product. Rather, it reiterates the law applicable to traditional product sellers and manufacturers.[4] However, we find it persuasive that

---

4. *Krosky v. Ohio Edison Co.*, 20 Ohio App.3d 10, 484 N.E.2d 704 (1984) (strict liability may be imposed upon a *manufacturer* of a product for the failure to provide an adequate warning which creates an unreasonably dangerous condition). *Knitz v. Minister Machine Co.*, 69 Ohio St.2d 460, 432 N.E.2d 814 (1982). *See also Leichtamer v. American Motors Corp.*, 67 Ohio St.2d 456, 424, N.E.2d 568 (1981); *Lonzrick v.*

the Ohio courts have held, with great certainty, that "there are virtually no distinctions between Ohio's 'implied warranty in tort' theory and the Restatement version of strict liability in tort." *Temple v. Wean United, Inc.*, 50 Ohio St.2d at 322, 364 N.E.2d 267. *See also Knitz v. Machine Co.* 69 Ohio St.2d 460, 463, 432 N.E.2d 814 (1982). Under Ohio law, if the predominant factor and purpose of the contract is the rendition of services, with the sale of goods only incidentally involved, the breach of such hybrid-sales contract is not actionable under an implied warranty theory. *Allied Industrial Service Corp. v. Kasle Iron and Metals, Inc.*, 62 Ohio App.2d 144, 405 N.E.2d 307. We conclude that the Ohio courts would not impose strict liability upon a provider of services, where the sale of a product is incidental, just as they would do when the breach of an implied warranty is alleged.

Our holding is consistent with the present state of the law as it relates to builder-vendors or design engineers in Ohio, which declines to impose either strict liability or liability premised upon breach of implied warranties. *Velotta v. Leo Petronzio Landscaping, Inc.*, 69 Ohio St.2d 376, 433 N.E.2d 147.

> To permit recovery under implied warranty without requiring proof of negligence would be in the nature of strict liability; it would make the builder-vendor an insurer and would disregard '. . . the harsh truth that unfortunate problems arise on real estate and in real structures which no prudence can avoid and which defy every reasonable skill.' *Id.* at 378 [433 N.E.2d 147] (*quoting Mitchem v. Johnson*, 7 Ohio St.2d 66 [218 N.E.2d 594] (1966)). *See also City of Cincinnati v. Stanley Consultants, Inc.*, Slip Op. C–83–815 (Ham.Cty.Ct.App. November 7, 1984); *McMillan v. Brune-Harpenau-Torbeck Builders, Inc.*, 8 Ohio St.3d 3 [455 N.E.2d 1276] (1983).

Moreover, this cause of action arises out of a contract between sophisticated parties, and therefore, the justifications for imposing strict liability upon the defendants are not applicable in this case.

We also conclude that plaintiffs' contention that Sargent and Lundy should be held strictly liable for misrepresentations made while selling its services is without merit. Restatement (Second) of Torts § 552C (1977) provides:

> One who, in a sale, rental or exchange transaction with another, makes a misrepresentation of a material fact for the purpose of inducing the other to act or refrain from acting in reliance upon it, is subject to liability to the other for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation, even though it is not made fraudulently or negligently.

■ Plaintiffs argue that section 552C is applicable in this case because the complaint alleges that plaintiffs were induced to enter into contracts with the defendants on the basis of Sargent and Lundy's material misrepresentations, including assurances that the Zimmer containment was designed to satisfy all regulations of the Nuclear Regulatory Commission. We disagree.

From the outset, we note that Ohio has not adopted the tort of innocent misrepresentation and the application of strict liability, encompassed by Restatement (Second) of Torts § 552(C). At most, one is responsible for a statement or representation made when a prudent person might know the truth of the facts upon which that statement or representation is founded. *Mulvey v. King*, 39 Ohio St. 491 (1883). We decline to extend Ohio law any further. Accordingly, Count XII of the amended complaint, which purports to impose strict liability upon Sargent and Lundy, is dismissed.

■ Counts XIII (alleging negligent misrepresentation), XIV (alleging professional malpractice), and XV (alleging willful and wanton misconduct) suffer from the same weaknesses as Counts IV, V, and IX, which pertain to defendant General Electric. The Court finds that plaintiffs'

*Republic Steel Corp.,* 6 Ohio St.2d 227, 218 N.E.2d 185 (1966).

claims, alleging tort, are all variations on plaintiffs' contract claims for the economic loss they have suffered, and therefore, should be dismissed.

## B. Plaintiffs' Contract Claims Against Sargent and Lundy

Count X of plaintiffs' amended complaint seeks rescission and restitution against Sargent and Lundy based upon breach of contract. Count XI seeks money damages for breach of contract.

■ Sargent and Lundy argues that Count X should be dismissed for two reasons: first, plaintiffs are unable to restore Sargent and Lundy to its original position and plaintiffs have reaped some benefit from the contract. Second, Sargent and Lundy asserts that plaintiffs are precluded from seeking the remedy of rescission because plaintiffs have recognized the validity of the contract.

Count X of plaintiffs' amended complaint alleges that Sargent and Lundy's contractual breaches "are so material, substantial, and fundamental that its contract may be declared to be rescinded and all moneys paid to it should be returned to the owners as restitution." However, Sargent and Lundy contends that the plaintiffs continue to utilize the instruments of the services it has provided pursuant to the contract because plaintiffs have announced their intention to convert the Zimmer Plant to a coal-fired plant. Under Ohio law, a party is not permitted to hold the fruits of his contract and at the same time repudiate it. *K.W. Ignition Co. v. Unit Coil Co.,* 93 Ohio St. 128, 112 N.E. 199 (1915). Sargent and Lundy also argues that because the contract was largely service oriented, plaintiffs cannot restore the consideration received under that contract, which is a prerequisite to the remedy of rescission.

An exception to the requirement of restoration has been carved out if what plaintiff has received is of no value to him. *See Taft v. Wildman,* 15 Ohio 123 (1840). However, at this stage of the proceedings, we are unable to determine, as a matter of law, what fruits of the contract plaintiffs have retained and their value. While it is true that plaintiffs plan to convert the Zimmer Plant to a coal-fired plant, we are unable to ascertain from the pleadings, how, or to what extent, the services provided by Sargent and Lundy will be utilized in that endeavor. Moreover, the Sixth Circuit has held that:

> While the general rule is that a party seeking to rescind must restore, or offer to restore, the consideration, or whatever he has received under the contract, the rule is not absolute, and shall not be strictly construed where restoration is impossible; but it is to be applied in accordance with equitable principles.

*Delta Investing Corporation v. Moore,* 366 F.2d 516, 520 (6th Cir.1966).

■ In the case before us, a return of the consideration, in the form of services already provided, is not possible. However, Ohio law does not require the impossible. It only requires one, who sues to recover what he had paid, to tender back the thing received by him so far as he is able. *Boesch v. Guarantee Title & Trust Co.,* 18 O.L.Abs. 655 (1935). Once the value of those services are ascertained, and in the event the Court orders rescission, the parties could be placed in the status quo by plaintiffs' tendering the pecuniary equivalent of the services provided. *See* 17 Am. Jur.2d *Contract* § 514. *See also Adams Laboratories v. Jacobs Engineering Company,* 486 F.Supp. 383 (N.D.Ill.1980); *Higby v. Whittaker,* 8 Ohio 198 (1837). Therefore, we conclude that the fact that plaintiffs may not be in a position to return exactly what they received under the contract does not bar them from seeking the remedy of rescission.

■ Finally, we conclude that the fact that plaintiffs recognize the existence of a contract between them and Sargent and Lundy, does not constitute a bar to the remedy of rescission. We recognize the inconsistency of Count XI, seeking the remedy of damages at law for breach of contract, and Count X, which seeks the equitable remedies of rescission and restitution. However, under the Rules of Civil Procedure, a party may state in his plead-

ing as many separate claims or defenses as he has regardless of consistency, and he may assert them whether based on legal or equitable grounds. 1 Ohio Jur.3d § 45. Fed.R.Civ.P. 8(e)(2) provides:

> A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many separate claims or defenses as he has regardless of consistency and whether based on legal, equitable, or maritime grounds.

At some point prior to or during the trial, plaintiffs will be required to make its election between an equitable or legal remedy. *See Venn-Severin Machine Co. v. John Kiss Sons Textile Mills, Inc.*, 2 F.R.D. 4 (D.N.J.1941). However, the fact that plaintiffs have plead inconsistent theories of recovery or remedies is not a basis for dismissing Count X.

Sargent and Lundy also argues that plaintiffs have affirmed the validity of the contract by allowing Sargent and Lundy to remedy any alleged breach of the contract. It asserts that "in continuing to operate as though the contract were still in force after the discovery of the alleged breach of duty, the plaintiffs elected to forego the remedy of rescission." Sargent and Lundy contends that plaintiffs allowed it to provide architectural and engineering services until January 21, 1984 when the decision to convert the plant to fossil-fueled was made. Therefore, defendant asserts the plaintiffs elected to have Sargent and Lundy rectify the alleged breach. A similar argument was made by General Electric in relation to Counts I and II and the requirement of giving notice of the breach. Earlier in our opinion, we concluded that the circumstances surrounding this complex transaction did not justify the dismissal of Counts I and II, and those same facts weigh heavily against the dismissal of Count X. The general rule is that the right to rescind a contract must be exercised with great promptness. *Cincinnati, I. & W.R. Co. v. Indianapolis Union R. Co.*, 36 F.2d 323 (6th Cir.1929), *cert. denied*, 281 U.S. 754, 50 S.Ct. 408, 74 L.Ed. 1164 (1930).

> The right to rescind cannot be held suspended while the holder of the right experiments with other remedies or uses it as a weapon to induce better terms in the existing contract as an alternative to rescission.

■ At this stage of the proceedings, we cannot say that plaintiffs sat idly by and enjoyed the benefits of the services provided by Sargent and Lundy or experimented with other remedies or used their right to rescind to induce better terms in the existing contract. Like the contract between plaintiffs and General Electric, the contract between Sargent and Lundy and plaintiffs originated in the late 1960's. Plaintiffs assert that the work at the Zimmer site commenced in 1972 and by late 1974, Sargent and Lundy's work was supposedly finished and construction of the containment structure was nearly complete. Plaintiffs allege that it was only after the Zimmer containment was nearly complete and continuing until 1981, that Sargent and Lundy acknowledged the existence of several different kinds of destructive hydrodynamic forces it had previously ignored in designing the Zimmer containment. "During these years, the Zimmer containment and its complex contents were again and again reanalyzed, redesigned and reconstructed on the false premise that Sargent and Lundy had finally addressed the full extent of the hydrodynamic forces inherent in the pressure suppression system." (*See* doc. 86, p. 8). Plaintiffs allege that until the conversion decision in 1984, General Electric and Sargent and Lundy improperly assured them that all of the problems could readily be resolved. Had the problems at the Zimmer plant been remedied, we would have little difficulty in holding that plaintiffs should not now be entitled to reap the benefit and rescind the contract. However, we cannot determine from the pleadings that this is the case. Due to the complexities of cur-

ing any defect in the Zimmer Plant and the lengthy relationship between the parties, we decline to dismiss Count X.

Having narrowed this lawsuit, to this point, to include only plaintiffs' contract claims, we see no reason to dismiss plaintiffs' breach of contract claim (Count XI) as redundant.

## GENERAL ELECTRIC'S MOTION

### Counts XVI and XVII

Counts XVI and XVII of plaintiffs' second amended complaint (doc. 191) are claims brought against General Electric for fraud and for alleged violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961 *et seq.*, respectively. Plaintiffs represent that it was not until after the original complaint was filed in 1984 and discovery was well under way, that they uncovered evidence that General Electric actually knew of the destructive force generated by operation of its pressure suppression system and actually knew that remedying the defect in the system would require expensive design and construction changes. Based upon this newly discovered evidence, plaintiffs have filed a second amended complaint (the "1986 complaint") alleging fraud and violation of RICO, 18 U.S.C. § 1964.

### A. Fraud

General Electric moves this Court to dismiss plaintiffs' fraud claim (Count XVI) pursuant to Rule 12(b)(6), Fed.R.Civ.P., on the grounds that it merely restates plaintiffs' contract claims, that plaintiffs seek damages solely for frustrated contractual expectations in the nature of economic loss, and that such claim is time-barred.

General Electric argues that the thrust of both the 1984 and 1986 complaints is that it failed to disclose to plaintiffs that certain hydrodynamic phenomena rendered the NSSS technically unsound and unreliable; the only difference between the two being that, in Count XVI, plaintiffs have substituted the labels of fraud and concealment for the labels of willful and wanton misconduct and the failure to disclose delineated in the earlier complaint. The essence of the first part of defendants' argument relating to plaintiffs' fraud claim is that this claim should be dismissed on the same basis that we dismissed Counts III through IX earlier in this Opinion. That is, plaintiffs' fraud claim arises out of an alleged breach of contractual duties and purely economic loss.[5]

Plaintiffs respond that there is a fundamental difference between Count XVI and any of the claims raised in the 1984 complaint. Unlike the 1984 complaint, which charges that General Electric should have disclosed information that, through due diligence it should have known, the 1986 complaint alleges that General Electric actually knew certain facts and intentionally withheld and misrepresented those facts for the purpose of deceiving plaintiffs. Specifically, plaintiffs allege that:

When GE first disclosed to the Zimmer Owners in late 1974 and 1975 the existence and potential design significance of hydrodynamic loads for the Mark II containment at the Zimmer Plant, GE represented to the Owners that those loads had been recently discovered. In fact, the existence of suppression pool hydrodynamic loads was recognized by GE at least as early as 1958 and was a concern to GE engineers and managers in the 1960s and early 1970s. Between 1958 and 1972, GE personnel knew of every hydrodynamic phenomenon that caused loads on pressure suppression containments and equipment. However, in or-

---

**5.** We recognize that some of the elements of plaintiffs' willful and wanton misconduct (Count V), wrongful inducement (Count VI) and fraud (Count XVI) claims are similar. Although we believe that Counts V and VI presents a closer question than many of the other claims as to whether contract or tort law should prevail, we conclude that the allegation that defendant "knew or should have known" of certain problems in the NSSS made these claims more akin to negligence than fraud, and since purely economic loss is not compensable in negligence under Ohio law, *see Inglis v. American Motors Corp.*, 3 Ohio St.2d 132, 209 N.E.2d 583, those claims were dismissed. Moreover, we noted that even if Counts V and VI state more than a claim for negligence, to a large extent, they are incorporated in Count XVI of plaintiffs' second amended complaint.

der to promote the sale of its nuclear products in the face of stiff competition, GE concealed its knowledge of the deficiencies inherent in its containment concept for almost two decades and fraudulently induced the Zimmer Owners to buy its products, designs and services and to rely on its expertise. Once GE had firmly entrenched itself in the nuclear business, GE fraudulently disclaimed knowledge of those deficiencies and coerced and fraudulently induced its purchasers into financing a multi-million program to investigate and develop the fundamental technology of pressure suppression.

(Second Amended Complaint, doc. 191, ¶ 120).

Plaintiffs' complaint also alleges that over a period of twenty years, General Electric was aware that tests revealed dangerous hydrodynamic phenomena caused by pressure suppression, and that General Electric's engineers repeatedly discussed the problem and reported their concern in private memoranda which were never released to plaintiffs until during discovery in this lawsuit.

Plaintiffs state that despite this knowledge, prior to the execution of the contract, General Electric knowingly misrepresented "that its NSSS and Mark II pressure suppression containment concept were adequately tested, safe and reliable, and even encouraged the Zimmer Owners to rely on the cost savings its containment concept supposedly would entail." Plaintiffs allege that General Electric's deception continued even after the execution of the contract, despite knowledge of several additional incidents at operating plants and the results of tests that again demonstrated "the violence and intensity of suppression pool hydrodynamic loads." They contend that even when General Electric disclosed some information about hydrodynamic loads in 1974 and 1975, General Electric knowingly misrepresented that the discovery of hydrodynamic forces was a recent occurrence and could be handled at minimal cost.

Paragraphs 173 and 187 of plaintiffs' 1986 complaint provides as follows:

173. Rather than disclosing test results which had demonstrated the existence and design significance of severe hydrodynamic loads for more than fifteen years, GE deliberately and willfully in 1975 and thereafter sought to force owners of GE BWR plants with Mark II containments, including the Zimmer Owners, to pay for the costs of experimental and development work, as well as design changes required by analysis of hydrodynamic loads. To that end, GE repeatedly misrepresented in several communications to the Zimmer Owners and regulatory authorities that such hydrodynamic forces had been discovered only in the Mark III tests in 1973 and 1974 and as the result of recent incidents involving structural damage at operating plants.

187. Further, between 1975 and 1981, the Owners were fraudulently induced to enter into change orders and other agreements with GE for certain testing and analytical work to help correct deficiencies in the basic design of the Mark II containment, based on GE's false representations that hydrodynamic forces in suppression pools had just been discovered. Until discovery in this lawsuit, the facts establishing the falsity of GE's representations were unknown to and, in fact, concealed from the Zimmer Owners.

The essential elements of a fraud claim are as follows:

(a) a representation or, where there is a duty to disclose, concealment of a fact,

(b) which is material to the transaction at hand,

(c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,

(d) with the intent of misleading another into relying upon it,

(e) justifiable reliance upon the representation or concealment, and

(f) a resulting injury proximately caused by the reliance.

*Cohen v. Lamko, Inc.,* 10 Ohio St.3d 167, 169, 462 N.E.2d 407 (1984) (*citing Friedland v. Lipman,* 68 Ohio App.2d 255, 429 N.E.2d 456 (1980)).

We have carefully reviewed Counts III through IX of plaintiffs' 1984 complaint and Count XVI of plaintiffs' 1986 complaint. Upon consideration of those claims, we agree with plaintiffs that much more is asserted in plaintiffs' fraud claim (Count XVI) than a bald allegation of a malicious or bad faith breach of contract in an ill-fated attempt to transform a contract claim into a tort claim. Moreover, we conclude that plaintiffs have alleged the essential elements for a cause of action grounded in fraud. The gist of that claim is that General Electric misrepresented and concealed certain facts concerning its own observations and testing of hydrodynamic loads. At the same time, it continued to market that defective technology to plaintiffs and induced them to pay for additional experimental work.

Although few in number, there are Ohio cases which have permitted a party to a contract to go beyond compensatory damages, although the complaint primarily sounded in contract, where fraud or conversion was alleged. *Craig v. Spitzer Motors,* 109 Ohio App. 376, 160 N.E.2d 537 (1959); *Armstrong v. Feldhaus,* 87 Ohio App. 75, 93 N.E.2d 776 (1950). *See also Combs Trucking v. International Harvester,* 12 Ohio St.2d 241, 446 N.E.2d 883 (1984).

In *Saberton v. Greenwald,* 146 Ohio St. 414, 427, 66 N.E.2d 224 (1946) the Court stated:

> A person who has been injured by the fraud of another or others, by either a party or parties to a transaction or a third party or third parties committing fraudulent acts involving or bringing about the negotiation of a transaction, such transaction usually but not necessarily involving business or commercial dealings, may maintain an action at law in tort to recover damages for the injury received from the fraud and deceit perpetrated by such other or others. The foundation of the action is not contract but tort. Such action was at common law, and is in the states where common-law pleading still is employed, in the nature of an action on the case, and under common-law pleading or under the code form of action is denominated as the 'action of deceit.'

(*Quoting* 24 Am.Jur., 21, § 200.)

The ingredient of fraud, malice, or insult permits a jury to go beyond the rule of mere compensation to the party aggrieved and to award exemplary or punitive damages. *Roberts v. Mason,* 10 Ohio St. 278 (1859). Furthermore, we conclude that defendants' argument that *Meeker v. Shafranek,* 112 Ohio App. 320, 176 N.E.2d 293 (1960) is controlling on this issue, is not well-taken, as that case simply stood for the proposition that if a petition states a cause of action in contract, the nature of the action is not challenged by the mere fact that there is also contained therein a charge of tortious conduct. In *Meeker,* plaintiffs simply alleged an honest, but untrue representation by the seller which induced the sale of certain property, and the Court found the action to be one in contract. Unlike the allegations in *Meeker,* plaintiffs assert, in Count XVI, that defendants acted with actual knowledge and intent to deceive.

The standard of review by which we are bound has been set forth in *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). A motion to dismiss ought not to be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 45–46, 78 S.Ct. at 102 (footnote omitted). In addition, we must "accept as true all the well-pled allegations in the complaint under attack." *Great Lakes Steel v. Deggendorf,* 716 F.2d 1101, 1105 (6th Cir.1983); *Westlake v. Lucas,* 537 F.2d 857, 858 (6th Cir.1976). We conclude that plaintiffs' detailed allegations of General Electric's actual knowledge concerning hydrodynamic loads and its intentional non-disclosure states a cause of action, cognizable in fraud under Ohio law.

Defendants finally argue that plaintiffs' fraud claim is barred by the four-year statute of limitations set forth in Ohio Rev.

Code § 2305.09 for three reasons; first, Count XVI should be dismissed as it "demonstrates on its face that plaintiffs' fraud claim accrued no later than 1975 because plaintiffs knew by that time that General Electric's alleged representations concerning its ability to perform its obligations under the contract were not true";[6] Second the complaint fails to state, with particularity, the circumstances under which plaintiffs discovered the alleged fraud and their due diligence until the alleged fraud was discovered; and third, plaintiffs' allegation that they did not learn about General Electric's alleged fraud until discovery in this lawsuit is belied by plaintiffs' 1984 complaint which was filed before discovery commenced and yet contained the substance of the same fraud allegations set forth in Count XVI of the 1986 complaint.

Since we have already set forth, at some length, the differences between the 1984 and 1986 complaints, we will not belabor that point again. Therefore, we address defendants' third argument with brevity.

 The 1984 complaint simply charges that General Electric negligently misrepresented certain facts and wrongfully induced plaintiffs to enter into the contract. In contrast, in the 1986 complaint, the plaintiffs charge defendant with conscious deception, knowledge of the falsity of its misrepresentations, and intent to mislead in a calculated scheme to market its defective system and shift the burden of paying for experimental work to plaintiffs. To sustain a cause of action grounded upon fraud, plaintiffs must prove knowledge of falsity and an intent to mislead on the part of defendants. *See Cohen v. Lamko, Inc.,* 10 Ohio St.3d 167, 169, 462 N.E.2d 407. We conclude that plaintiffs would have been remiss in asserting a charge of such heinous activity prematurely and without any supporting evidence. The face of the two complaints reveals substantial differences in the nature of defendants' conduct alleged therein, and therefore, we decline to

dismiss plaintiffs' fraud claim on the basis that some of the facts alleged in the two complaints may be similar.

 A related matter is whether plaintiffs' fraud claim is stated with sufficient particularity to satisfy Rule 9(b) Fed.R. Civ.P. and whether it is barred by the statute of limitations. As a preliminary matter, we address the issue of the statute of limitations. On pages 54 and 55 of our opinion, we discuss the requirements of Rule 9(b) further. Our task, in considering a Rule 12(b) motion to dismiss, is to determine whether it appears beyond doubt that plaintiffs can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80. When an affirmative defense is raised in a motion to dismiss, the test is whether the complaint includes allegations of fact that effectively vitiate the ability to recover. A 12(b) motion can only be granted where the defense appears clearly on the face of the complaint. *McNally v. American States Insurance Co.,* 382 F.2d 748 (6th Cir.1967); Wright & Miller *Federal Procedure and Practice:* Civil § 1357. In applying this test, the complaint is to be construed in the light most favorable to the plaintiffs and their allegations taken as true. *Lee v. Western Reserve Psychiatric Habilitation Center,* 747 F.2d 1062, 1065 (6th Cir.1984).

Ohio Rev.Code § 2305.09 provides that: [a]n action for any of the following causes shall be brought within four years after the cause thereof accrued: (C) For relief on the grounds of fraud;
....
If the action is for trespassing under ground or injury to mines, or for the wrongful taking of personal property, the causes thereof shall not accrue until the wrongdoer is discovered; nor, *if it is for fraud, until the fraud is discovered.* (Emphasis added.)

 In taking plaintiffs' allegations as true, we find that the statute of limita-

---

**6.** Defendant has placed a caveat in its memorandum in support of its motion to the effect that it denies any fraud or misrepresentation has occurred and that its agreement concerning the

accural of plaintiffs' claims is directed only to what plaintiffs have alleged in their 1986 complaint.

tions defense does not appear conclusively from the face of the complaint, and therefore, we cannot grant defendants' motion on the grounds that the action was not timely filed. *Basile v. Merrill Lynch, Pierce, Fenner & Smith*, 551 F.Supp. 580 (S.D.Ohio 1982). The four-year statute of limitations for fraud does not begin to run until the fraud is discovered. Discovery, under Ohio law, is actual discovery, or what might have been discovered by due diligence. *Kettering v. Berger,* 4 Ohio App.3d 254, 260, 448 N.F.2d 458 (1982) (*citing Stivens v. Summers*, 68 Ohio St. 421, 67 N.E. 884 (1903)). Usually, the question of when a party discovered fraudulent conduct or when he should have discovered it by exercising diligence is a factual inquiry. *Roger v. Lehman Brothers Kuhn Loeb*, 604 F.Supp. 222 (S.D.Ohio 1984).

In paragraph 187 of the 1986 complaint, plaintiffs allege:

Until discovery in this lawsuit, the facts establishing the falsity of GE's representations were unknown to and, in fact, concealed from the Zimmer Owners.

Taking plaintiffs' allegation as true, plaintiffs' fraud claim is timely because the fraud was not discovered until sometime after November 1984. Moreover, we find that plaintiffs have plead the date of discovery with sufficient particularity, as even in cases in which the date of discovery is not specifically stated, we have held that an action will not be dismissed if it is conceivable from the face of the complaint that the action was timely brought. *Basile*, 551 F.Supp. at 592–93.

▆ A remaining question is whether plaintiffs should have discovered the alleged fraud earlier by exercising due diligence. Defendant argues that plaintiffs had every reason to suspect fraud, and a positive duty to investigate it, more than four years before the complaint was filed, citing plaintiffs' complaint in support. Specifically, plaintiffs allege that, as early as 1975, they learned through disclosures by General Electric and Sargent and Lundy that the NSSS and Mark II containment were not adequately tested, safe and reliable and had to be substantially modified.

We conclude that the mere fact that plaintiffs were aware of a defect as nearly as 1975 does not necessarily mean that they had reason to know of possible fraud. *Burr v. Board of County Commissioners*, 23 Ohio St.3d 69, 491 N.E.2d 1101 (1986). Given the complexity of the transactions and relationships between the parties, we conclude that the question of when plaintiffs should have discovered the fraud by exercising due diligence is better left for a jury. *Roger v. Lehman Brothers Kuhn Loeb*, 604 F.Supp. 222 (S.D.Ohio 1984).

## B. Racketeer Influenced and Corrupt Organizations Act

Plaintiffs' RICO claim (Count XVII) relies essentially upon the same set of facts alleged in Count XVI. Plaintiffs allege that each of defendants' fraudulent acts was

Undertaken with the specific intent to defraud the Zimmer Owners and involved use of the mails in furtherance of two fraudulent schemes: (1) a scheme to induce fraudulently the Zimmer Owners to enter into the original contract with GE, and (2) a scheme to conceal GE's early knowledge of hydrodynamic loads in order to induce fraudulently the Zimmer Owners to enter into change orders to their original contract with GE and to pay GE for its work on the technical and licensing problems caused by the so-called 'new' hydrodynamic loads. In addition to the use of the mails to transmit fraudulent information to the Zimmer Owners, the mails were used in furtherance of GE's schemes to defraud the Zimmer Owners when GE invoiced and received payment from the Zimmer Owners. Each use of the mails by GE to further its fraudulent schemes constitutes a separate act of mail fraud under 18 U.S.C. § 1341, and a separate act of racketeering activity under RICO.

Plaintiffs allege that the use of the mails to further the fraudulent schemes constitutes mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343 and is, therefore, racketeering activity as defined by RICO, 42 U.S.C. § 1961(1) and prohibited by § 1962. Plaintiffs assert that this violation

of RICO entitles them to treble damages for the injury caused thereby. They have alleged that General Electric is a "person" under section 1961(3) because it is an entity capable of holding a legal or beneficial interest in property, and that there are at least three "enterprises" as defined in section 1961(4) of RICO [7] that were involved in the construction of the Zimmer Plant: General Electric, because it was a corporation, the Zimmer Owners, because they joined together as a legal entity for the common purpose of constructing, licensing, and operating the Zimmer Plant, and the Mark II Owners, because its members joined together as a legal entity for the purpose of resolving the technical and licensing problems caused by the "new" hydrodynamic loads affecting the Mark II containment.

Section 1964(c) of RICO states that:

Any person injured in his business or property by reason of a violation of Section 1962 of this chapter may sue therefore in any appropriate United States District Court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

Section 1962 has four subsections; a reading of plaintiffs' 1986 complaint and memorandum in opposition indicates plaintiffs are alleging defendant violated subsections (a), (b) and (c) of 18 U.S.C. § 1962, which provide as follows:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which, affect interstate or foreign commerce....

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

Therefore, the elements of a section 1962 violation are as follows: (1) a "person" (2) through the commission of indictable or punishable acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invested in, acquired or maintained an interest in, or conducted or participated in the conduct of the affairs of (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce. *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984); *Griffin v. O'Neal, Jones & Feldman, Inc.*, 604 F.Supp. 717, 720–21 (S.D.Ohio 1985).

"Racketeering activity" is defined as, among other things, any act which is indictable under 18 U.S.C. § 1341 (Mail Fraud) or 18 U.S.C. § 1343 (Wire Fraud). Section 1961(1). Section 1341 is violated by use of the United States mail in furtherance of a scheme to defraud. *Pereira v. United States,* 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954). A "pattern of racketeering activity" requires at least two acts of racketeering activity within ten years of each other. Section 1961(5). A "person" under RICO is defined as "any individual or entity capable of holding a legal or beneficial interest in property." Section 1961(3). Finally, an "enterprise" "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

RICO has a criminal provision (section 1962) and a civil remedies provision (section

---

7. An "enterprise includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

1964) and there can be no recovery of damages under section 1964 unless there has been a violation of section 1962. The issue, therefore, is whether plaintiffs have alleged a violation of section 1962 of RICO which would entitle them to recover damages under section 1964.

Defendant argues that plaintiffs' RICO claim is legally insufficient for six reasons: (1) the 1986 complaint does not properly allege that General Electric engaged in acts of racketeering activity; (2) plaintiffs have not adequately alleged that General Electric engaged in a pattern of racketeering activity; (3) the RICO claims are barred by the statute of limitations; (4) the 1986 complaint does not properly state a claim for General Electric's alleged violation of section 1962(a); (5) 1962(b); and (6) 1962(c). We address each of these arguments in turn.

### (1) Acts of Racketeering Activity

Defendant argues that Count XVII does not plead "with particularity," as required by Fed.R.Civ.P. 9(b), that General Electric engaged in "acts of racketeering activity" (or "predicate acts") by violating the federal wire and mail fraud statutes, 18 U.S.C. §§ 1341, 1343. Specifically, defendants maintain that plaintiffs must plead facts showing that there is probable cause to believe that General Electric used the wires or mails with the specific intent to execute a scheme to defraud them and must plead the "time, place and contents of false representations, as well as the identity of the party making the misrepresentation and what was obtained or given up thereby." *Bennett v. Berg,* 685 F.2d 1053, 1062, *adopted on rehearing en banc,* 710 F.2d 1361 (8th Cir.1982), *cert. denied,* 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983).

■ We agree with defendant that, in order to satisfy the requirements of Fed.R. Civ.P. 9(b), plaintiffs must allege that defendant acted with intent to defraud. *Epstein v. United States,* 174 F.2d 754 (6th Cir.1949), although intent can be averred generally. *See Bender v. Southland Corp.,* 749 F.2d 1205, 1216 (6th Cir.1984). Moreover, a plaintiff pleading fraud must allege the time, place, and contents of the misrepresentations. *Id.* However, such facts need only be plead in a fashion "sufficient to give defendant notice of the claims against it." *Jordan v. Global Natural Resources, Inc.,* 564 F.Supp. 59, 69 (S.D. Ohio 1983). The liberal notice-pleading procedure of the Federal Rules of Civil Procedure, and of *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, apply in assessing the adequacy of a RICO claim. *Howell Petroleum Corporation v. Weaver,* 780 F.2d 1198, 1199 (5th Cir.1986). Therefore, if the pleadings place defendant on notice of the precise misconduct or fraudulent acts claimed, as an alterative to pleading the time, date and places of the wire and fraud violations, Rule 9(b) is satisfied.

■ From our reading of plaintiffs' lengthy 1986 complaint, we conclude that the pleading sufficiently apprises defendant of the particularities of its alleged wrongdoing to satisfy Rule 9(b), Fed.R. Civ.P. Paragraphs 193 and 194 charge that defendant acted with intent to fraudulently induce the Zimmer Owners to enter into the original contract with General Electric and to conceal General Electric's early knowledge of hydrodynamic loads in order to fraudulently induce them to enter into change orders to their original contract. Certainly, General Electric has firsthand knowledge of when these transactions were entered into, as defendant has listed specific dates of fifty-six General Electric invoices in its own Exhibits attached to its counterclaim for payments. Plaintiffs further allege that the mails and wires were used to accomplish each of defendants' unlawful schemes and the subject matter of defendants' fraudulent statements and omissions are outlined in thirty-eight paragraphs of the 1986 complaint. Therefore, we find that the requirements of Rule 9(b) were clearly met.

■ Defendants also argue that plaintiffs' RICO claims should be dismissed for failure to plead the predicate acts of mail and wire fraud with sufficient particularity to show "probable cause." RICO is aimed at "racketeering activity" which is defined as any act "indictable" under numerous specific criminal provisions, including mail

and wire fraud. Section 1961(1). Although Congress has provided criminal penalties for such activity, *see* section 1963, it has also set forth a broad civil enforcement scheme in section 1964. Recently, the Supreme Court has pronounced "[t]hat the offending conduct is described by reference to criminal statute does not mean its occurrence must be established by criminal standards or that the consequences of a finding of liability in a private civil action are identical to the consequences of a criminal conviction." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 105 S.Ct. 3275, 3283, 87 L.Ed.2d 346 (1985). Our parent circuit, even prior to the decision in *Sedima,* cautioned that Congress intended that RICO be liberally construed to effectuate its remedial purposes and that the civil remedy it provides is independent of criminal proceedings. *See USACO Coal Company v. Carbomin Energy, Inc.*, 689 F.2d 94, 95 n. 1 (6th Cir.1982). Clearly, a criminal conviction is no longer a predicate to liability which must be specifically plead under the civil RICO provisions. *Sedima,* 473 U.S. 479, 105 S.Ct. 3275. However, there remains a divergence of opinion on the issue of whether the necessary predicate acts must be alleged with enough specificity to show there is probable cause that the crimes were committed. *Bache, Halsey Stuart Shields, Inc. v. Tracy Collins Bank & Trust, Co.*, 558 F.Supp. 1042, 1045–46 (D.Utah 1983) and *Taylor v. Bear Stearns & Co.*, 572 F.Supp. 667, 682–83 (N.D.Ga.1983), decided prior to *Sedima,* clearly support defendants' position.[8] On the other hand, the Seventh Circuit in *Haroco v. American National Bank and Trust Company of Chicago*, 747 F.2d 384, 404 (7th Cir.1984), *aff'd,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985), found this issue most troublesome and rejected the "probable cause" requirement at the pleading stage for the following reasons:

To establish its case at trial, a civil plaintiff must surely prove the acts of racketeering, but the district courts in *Bache Halsey* and *Taylor* appear to have moved that requirement up to the pleadings stage. For several reasons, we do not agree that such specificity is required *at the pleadings stage.*

First a determination of probable cause in the criminal context ordinarily involves some evaluation of the reliability of specific evidence. Even the most specific allegations do not establish probable cause unless they are reliable. We are, to say the least, perplexed as to how a court might undertake such evaluations of reliability in deciding a motion to dismiss under Rule 12. *See Sedima [S.P.R.L. v. Imrex Co. Inc.]*, *supra,* 741 F.2d [482] at 501 & n. 56 [2nd Cir.1984] (relationship between 'probable cause' in complaint and plaintiff's burden at trial 'remains something of a mystery').

With respect to *Bache Halsey's* discussion of grand juries, it should be recalled that a grand jury has significant investigative powers and resources, including a broad subpoena power. Before it decides whether to indict a person, it has extensive opportunities to discover and evaluate relevant facts. It should be obvious that a civil plaintiff has no similar discovery rights until it files its complaint. Yet the approach of the district court in *Bache Halsey* appears to require a plaintiff to establish a case before any discovery is permitted. The *Bache Halsey* court argued that such specificity was needed in order to evaluate the merits of a claim and to distinguish between well-founded and frivolous claims. 558 F.Supp. at 1046. While the court's motives are admirable, its approach seems to us to be impractical. We see no grounds for demanding that a civil RICO plaintiff essentially plead evidence and prove the case in the complaint. (Footnotes omitted.)

---

8. General Electric also cites the Post-*Sedima* case of *Medallion TV Enterprises v. SelecTV of California*, 627 F.Supp. 1290, 1293 (C.D.Cal. 1986) in support of its position that the predicate acts of mail and wire fraud must sufficiently appear in the complaint to show probable cause. However, that decision arose out of a motion for summary judgment pursuant to Fed. R.Civ.P. 56 and we decline to rely upon it in considering defendants' motion to dismiss at this stage of the proceeding.

*See also Tryco Trucking Co. v. Belk Store Services, Inc.,* 608 F.Supp. 812, 815–16 (W.D.N.C.1985). We find the reasoning in *Haroco* persuasive and therefore, conclude that the complaint need not satisfy a probable cause specificity standard. Indeed, we question whether to hold otherwise would be inconsistent with the Supreme Court's decision in *Sedima,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985).

Having concluded that plaintiffs have sufficiently alleged the necessary predicate acts under RICO, as well as the requisite intent, we also reject defendants' contention, for purposes of a motion to dismiss, that plaintiffs have attempted to transform a simple contract action into a RICO claim. The broad language of the statute and the *Sedima* decision make clear that RICO is applicable to violations committed in the commercial setting and that "[a]n allegation of fraud in a contract action can transform an ordinary state law claim into a federal racketeering charge." *See R.A. G.S. Couture, Inc. v. Hyatt,* 774 F.2d 1350, 1355 (5th Cir.1985).

### (2) Pattern of Racketeering Activity

General Electric next argues that the plaintiffs' RICO claim should be dismissed because the 1986 complaint does not adequately allege that it engaged in a "pattern" of racketeering activity. Again, the seminal case in this area is the recent Supreme Court decision in *Sedima,* 473 U.S. at 496, 105 S.Ct. at 3285, which provided the following gloss for the definition of "pattern"

> [T]he definition of a 'pattern of racketeering activity' differs from the other provisions in § 1961 in that it states that a pattern 'requires at least two acts of racketeering activity,' § 1961(5), not that it 'means' two such acts. The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a 'pattern.' The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: 'The target of [RICO] is thus not sporadic activity. The infil-

> tration of legitimate business normally requires more than one "racketeering activity" and the threat of continuing activity to be effective. It is this factor of continuity plus relationship which combines to produce a pattern.' S.Rep. No. 91–617, p. 158 (1969). Similarly, the sponsor of the Senate bill, after quoting this portion of the Report, pointed out to his colleagues that '[t]he term "pattern" itself requires the showing of a relationship.... So, therefore, proof of two acts of racketeering activity, without more, does not establish a pattern....' 116 Cong. Rec. 18940 (1970) (statement of Sen. McClellan). See also *id.,* at 35193 (statement of Rep. Poff) (RICO 'not aimed at the isolated offender').... 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14.

Although the *Sedima* decision, which abrogates the requirement of a prior criminal conviction, will most likely bring about a substantial increase in civil RICO cases involving commercial and business disputes, the broad sweep of RICO is somewhat tempered by a stricter concept of "pattern" supported by *Sedima* and employed by many lower courts. For instance, Judge Shadur in *Morgan v. Bank of Waukegan,* 615 F.Supp. 836, 837–38 (N.D.Ill.1985), commenting upon the unease of the federal judiciary presented by the broad sweep of civil RICO stated:

> As often happens, the sense of the disquietude—the nagging sense that something is wrong, though it is difficult to put a finger on just what—was sound, even though the perceived ailment was mistaken. *Sedima,* 105 S.Ct. at 3285 n. 14 and 3287 (though in *dictum* ) supplied the clue that the courts had been mistaken in viewing two mailings—a *necessary* ingredient under section 1961(5) of a 'pattern of racketeering activity' violated section 1962—as a *sufficient* condition to establish such a 'pattern.' This Court has recently responded to the Supreme Court's invitation for 'the courts to develop a meaningful concept of "pattern" ' (*Sedima,* 105 S.Ct. at 3287) in *Northern Bank/O'Hare, N.A. v. Inryco, Inc.,* 615 F.Supp. 828 (N.D.Ill.1985) and it will continue to do so here. (Emphasis original.)

In *Inryco, Inc.*, 615 F.Supp. 828, 833 (N.D.Ill.1985), Judge Shadur concluded that two acts of mail fraud did not necessarily constitute a "pattern of racketeering activity" and noted:

> True enough, 'pattern' connotes similarity, hence the cases' proper emphasis on relatedness of the constituent acts. But 'pattern' also connotes a multiplicity of events: Surely the continuity inherent in the term presumes repeated criminal *activity*, not merely repeated *acts* to carry out the *same* criminal activity. It places a real strain on the language to speak of a single fraudulent effort, implemented by several fraudulent acts, as a 'pattern of racketeering activity.'

615 F.Supp. at 831 (emphasis original).

 Defendant has cited numerous cases that have employed the rationale in *Inryco* which have held that the "pattern" concept requires that predicate acts must be alleged to have occurred in connection with more than one transaction or criminal episode. In *Frankart Distributers, Inc. v. RMR Advertising, Inc.*, 632 F.Supp. 1198 (S.D.N.Y.1986) the Court noted, "[m]ost substantial business transactions involve two or more use of the mail, and that, in the absence of a multiple episode requirement, the result "would be to sweep into federal courts, under RICO, the great majority of actions for fraud in commercial transactions." *Id.* at 1201. *See Superior Oil Co. v. Fulmer*, 785 F.2d 252 (8th Cir. 1986), *Allington v. Carpenter*, 619 F.Supp. 474, 478 (C.D.Cal.1985); *Professional Assets Management, Inc. v. Penn Square Bank, N.A.*, 616 F.Supp. 1418, 1421–22 (W.D.Okla.1985). *See also Evanston Bank v. Conticommodity Services, Inc.*, 623 F.Supp. 1014 (N.D.Ill.1985) (in the commodities fraud area, the word "pattern" and a reading of *Sedima* require at least two fraudulent schemes, related by common purposes, rather than just one episode of

fraud involving two uses of the telephone in support of a single scheme to "churn" an account).[9] Although all Courts are not in agreement on this issue,[10] until this question is resolved by the Courts or Congress through appropriate legislation, we adopt the reasoning of Judge Shadur in *Inryco, Inc.*, 615 F.Supp. 828 and find that more than one transaction or criminal episode is required to constitute a pattern of racketeering activity.

Our task, now, is to determine whether plaintiffs have sufficiently alleged that General Electric engaged in multiple acts of racketeering activity, occurring in different transactions or "criminal episodes." Again, we view the complaint liberally, as required by *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Defendant argues that the complaint is deficient because it artificially divides a single transaction or episode (a contract for the provision of the NSSS and related services) into two separate "schemes." It argues that plaintiffs' allegation that there were two separate fraudulent schemes, first, to induce the Zimmer Owners to enter into the original contract, and second, to conceal General Electric's early knowledge of hydrodynamic loads in order to induce the Zimmer Owners to enter into change orders to their original contract, does not remedy this defect for the following reasons. First, the written contract was entered into in 1969, and the RICO statute requires that at least one predicate act must have occurred after the statute's effective date of October 15, 1970. *See* 18 U.S.C. § 1961(5). Defendant further argues that even if, by "original contract," plaintiffs meant that the contract was fully executed in May, 1972, General Electric's transmission of certain drawings to Sargent & Lundy and a cover letter to plaintiffs in November 1969 constitutes only one predicate act that occurred before May 1972 and is not a "pattern of racketeering

---

**9.** *See also Fleet Management Systems, Inc. v. Archer-Daniels Midland Co.*, 627 F.Supp. 550, 3 RICO Law Rep. 386, 394–95 (C.D.Ill.1986); *Kredietbank N.V. v. Morris*, 3 RICO Law Rep. 264, 271 (D.N.J.1985); *Medallion TV Enterprises, Inc. v. Select TV of California, Inc.*, 3 RICO Law Rep. 310, 315 (C.D.Cal.1985).

**10.** *See United Fish Co. v. Barnes*, 627 F.Supp. 732, 735 (D.Me.1986); *Trak Microcomputer Corp. v. Wearne Bros*, 628 F.Supp. 1089 (N.D.Ill. 1985) (McGarr, J.).

activity." If defendants' first contention is correct, all that is left is a single "scheme" by General Electric to induce plaintiffs to enter into change orders to the original contract. The thrust of defendants' point is that plaintiffs have arbitrarily divided a single transaction into multiple sub-schemes.

■ We disagree with defendants' characterization that the 1986 complaint merely alleges one transaction or fraudulent episode. On its face, the complaint alleges two distinct schemes, the first continuing until execution of the contract in May of 1972 and involving more than one predicate act after the effective date of the RICO statute,[11] and the second beginning in 1974 involving numerous change orders and the use of the mail and wires.[12]

For the foregoing reasons, we conclude that defendants' argument that the 1986 complaint does not adequately allege that General Electric engaged in a "pattern" of racketeering activity is without merit.

### (3) Statute of Limitations

Where "Congress has not established a time limitation for a federal cause of action, the settled practice has been to adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so." *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 1942, 85 L.Ed.2d 254 (1983). Our parent Circuit has held that since the "federal RICO statute is not such a 'uniquely federal remedy' as § 1983, ... the selection of the applicable state limitations period in the individual case should be made on the basis of a characterization of the kind of factual circumstances and legal theories presented." *Silverberg v. Thomson McKinnon Securities, Inc.*, 787 F.2d 1079, 1083 (6th Cir.1986). Therefore, we must determine what the most analogous Ohio statute of limitations is.

■ Defendant urges this Court to apply the four-year limitations period for fraud, Ohio Rev.Code § 2305.09, because, obviously, there is a close correlation between plaintiffs' common law fraud claim and their RICO claims. At first glance, defendants' invitation is appealing, particularly in light of *Silverberg*, 787 F.2d 1079, which applied the four-year statute of limi-

---

**11.** Paragraph 193 alleges "that the acts enumerated in paragraph 190 above, [plaintiffs 1 through 41, 43 through 49, 54 through 55, 60 through 64, 67, 72 through 77, 80 through 81, 85, 86, 91 through 92, and 120 through 189] constitute 'racketeering activity under § 1961(1)(B) of RICO because they constitute violations of 18 U.S.C. § 1341, the mail fraud statute.'" Paragraph 157 alleges that "[t]hroughout the period between 1970 and 1972, ... GE made several representations to the Owners and to the AEC with respect to the capability of the Mark II containment to withstand the energy released to the containment during normal operations and accidents." Paragraphs 164 and 167 allege that "[i]n contract negotiations between GE and the Zimmer Owners lasting until May 1972 and in ... correspondence, GE concealed from the Owners its knowledge of SRV-related testing deficiencies and its internal concerns about baffle dislocations ... and its knowledge of the tremendous vibrations which ripped open the containment at the Wurgassen Plant."

**12.** As to the second scheme, plaintiffs allege that between 1972 and 1975, "GE's misleading transmittal letters indicated that much of the data and recommendations contained in the reports were irrelevant to the design of the Mark II containment at the Zimmer Plant." Paragraph 176 alleges that

[t]hroughout 1975, GE implemented its corporate strategy of shifting responsibility for handling the problem of suppression pool hydrodynamic loads. For example, on April 9, 1975, A.P. Bray, the Manager of GE's Projects Department, wrote the Nuclear Regulatory Commission ("NRC") to provide some clarification regarding concerns with pressure suppression containment designs. Bray represented that hydrodynamic phenomena, such as water movement effects due to vent clearing actions, were first diagnosed in the Mark III tests. Further, despite the abundant containment design information GE had provided to the Zimmer Owners, GE licensing engineers told the NRC in early 1975 that GE had no contractual responsibility for Mark II containment design. On October 28, 1975, as part of his effort to coerce utilities to fund GE's new development work, Bray wrote the Mark II utility executives, including Zimmer Owners, and falsely asserted that the need for an evaluation of Mark II containment designs was brought about by the "discovery" of certain dynamic phenomena, primarily effects resulting from the purging of air through and from discharge vents into the suppression pool, which was "not available" when the original Mark II containment designs were completed.

tations for fraud to plaintiffs' RICO claim. However, we cannot ignore Ohio's recently enacted Corrupt Activity Act, Ohio Rev. Code § 2923.32, effective January 1, 1986, which takes its definition of "racketeering activity" directly from 18 U.S.C. § 1961. *See* Ohio Rev.Code § 2923.31(I). Section 2923.34(K) provides the following limitations period:

> Notwithstanding any other provision of law providing a shorter period of limitations, a civil proceeding or action under this section may be commenced at any time within five years after the unlawful conduct terminates or the cause of action accrues or within any longer statutory period of limitations that may be applicable....

Although we agree with defendants' contention that plaintiffs' RICO claim is analogous to a state fraud claim, we conclude that the state statute which encompasses the precise conduct alleged here, that is wire and mail fraud, and proscribes engaging in a pattern of corrupt activity, should be applied. We believe that this result is not inconsistent with the opinion of the Sixth Circuit in *Silverberg*, because the question of the applicability of Ohio Rev. Code § 2923.32 was not before the Court, as unlike in this case, the RICO claim was apparently filed and the district court ruled prior to the state's effective date.

The next step in our analysis is to determine when the limitations period commenced in this case. Section 2923.34(K) identifies two alternative points in time that commence the limitations period: (1) the termination of the "unlawful conduct" or (2) when the cause of action accrues. Defendant urges that this Court is not bound to apply either alternative, as "[g]enerally, federal courts hold that where periods of limitations are so provided by state law, federal law, not state law, governs such matters as accrual of causes of action and tolling." *Silverberg*, 787 F.2d at 1082 (citing *Gaudin v. KDI Corp.*, 576 F.2d 708 (6th Cir.1978); *Biggans v. Bache Halsey Stuart Shields, Inc.*, 638 F.2d 605 (3d Cir. 1980); *ITT v. Cornfeld*, 619 F.2d 909 (2d Cir.1980)). The determination of when plaintiffs' cause of action for RICO accrues

under federal law is a much more difficult matter, as their appears to be no consensus among the Courts as to the date on which that period begins. The Eighth, Ninth and Eleventh Circuits are of the opinion that the statute of limitations in civil RICO cases begins to run when a plaintiff knows or should know of the injury. *See Alexander v. Perkin Elmer Corp.*, 729 F.2d 576 (8th Cir.1984) (suit barred where plaintiff admitted knowledge of the pattern of misrepresentation more than five years before the suit was filed); *Compton v. Ide*, 732 F.2d 1429 (9th Cir.1984); and *Bowling v. Founders Title Company*, 773 F.2d 1175 (11th Cir.1985) (applied a one-year statute of limitations and barred RICO claim where plaintiffs "learned that they had been deceived" more than one year prior to filing suit). Other Courts have found that the time period begins when plaintiffs knew of their injuries and "the reasons for those injuries," *Seawell v. Miller Brewing Co.*, 576 F.Supp. 424, 429 (M.D.N.C.1983) or from the date of discovery of the fraud. *D'Iorio v. Adonizio*, 554 F.Supp. 222, 224 (M.D.Pa.1982). In *Steven Operating, Inc. v. Home State Savings*, 105 F.R.D. 7, 12 (S.D.Ohio 1984) Judge Rice held that a cause of action for RICO accrues when plaintiffs "knew or should have known of the fraud" and that issues of fact remained to be determined by the jury. On the other hand, the Second Circuit appears to measure accrual from the last act of racketeering activity. *See Durante Bros. and Sons, Inc. v. Flushing National Bank*, 755 F.2d 239, 249 (2d Cir.1985).

■ We find that the better view is that the statute begins to run from the time plaintiffs knew or should have known of the fraud because it is consistent with our analysis regarding plaintiffs' state common law fraud claim as well as with the second alternative set forth in Ohio Rev.Code § 2923.34(K). In our discussion concerning the timeliness of plaintiffs' fraud claim (Count XVI), we concluded that the mere fact that plaintiffs were aware of a defect as early as 1975 does not necessarily mean that they had reason to know of possible fraud and that given the complexity of the

relationship and transactions between the parties, the question of when plaintiffs had reason to know of the fraud or should have discovered it by exercising due diligence was better left for the jury. *Roger v. Lehman Brothers Kuhn Loeb*, 604 F.Supp. 222. That same reasoning applies equally to the question of the timeliness of plaintiffs' RICO claims and therefore, we decline to dismiss Count XVII on the ground that plaintiffs' RICO claims are time barred.

### (4) Sufficiency of Pleading a Violation of § 1962(a)

Section 1962(a) provides that "[i]t shall be unlawful for any person who has received any income derived ... from a pattern of racketeering activity ... to use or invest ... any part of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise...." Plaintiffs allege that General Electric is a "person" and that there are at least three "enterprises" that were involved in the construction of the Zimmer Plant: General Electric, the Zimmer Owners, and the Mark II Owners Group. They further allege that General Electric used racketeering activity income "in the operation of its own corporate enterprise" and "in the acquisition of an interest in and operation of the enterprise made up of the Mark II Owners Group." General Electric argues that the 1986 complaint does not properly state a claim for a violation under section 1962(a) because it does not properly define or designate an "enterprise" or that the plaintiffs suffered injury "by reason of" General Electric's alleged violation of section 1962(a). For the foregoing reasons, we conclude that plaintiffs' section 1962(a) claim should be dismissed because they have not alleged an injury suffered "by reason of" a violation of section 1962(a). Therefore, it is unnecessary to determine whether General Electric can be an enterprise as well as a person for purposes of section 1962(a). However, we address whether the Mark II Owners Group and the Zimmer Owners can constitute enterprises here, as we revisit those same arguments in regard to plaintiffs' section 1962(b) and (c) claims.

Plaintiffs have alleged that the Zimmer Owners and the Mark II Owners Group are "enterprises," collaborating for common purposes in the construction of nuclear power plants and that General Electric "was a member of and technical program manager to the Mark II Owners Group. In this capacity, General Electric conducted a series of test programs and analytical studies for the purpose of ascertaining information concerning hydrodynamic loads. General Electric shared in the cost of, and gained economic benefit from, the program, held voting rights in the enterprise and obtained proprietary rights to data, reports and analyses produced by the program."

The RICO statute defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The enterprise is proven by the existence of a continuing organization with a framework for carrying out decisions and by evidence that the members function as a continuing unit with established duties. *United States v. Sinito*, 723 F.2d 1250, 1262 (6th Cir.1983), *cert. denied*, 469 U.S. 817, 105 S.Ct. 86, 83 L.Ed.2d 33 (1984). Moreover, the enterprise must be separate and apart from the pattern of racketeering activity. *See United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981); *United States v. Riccobene*, 709 F.2d 214 (3d Cir.), *cert. denied, sub nom. Ciancaglini v. United States*, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983).

Defendant General Electric maintains that the criteria for an "enterprise" are not satisfied by the 1986 complaint because "[a]part from the conclusory allegation that the Mark II Owners Group is a 'legal entity,' the Complaint does not allege that it is an 'ongoing' organization, that it has a 'framework or superstructure' for making decisions, or that it has 'established duties.'"

We decline to compel plaintiffs to "plead essentially evidence and prove the case in the complaint." *See Haroco, Inc. v. American National Bank and Trust Co.,* 747 F.2d 384, 404. The Third Circuit has also cautioned against confusing what must be pleaded with what must be proved, stating:

> *Riccobene* and *Turkette* certainly stand for the proposition that a plaintiff, to recover, must prove that an alleged enterprise possesses the three described attributes. But neither case speaks to what must be pleaded in order to state a cause of action. The district court erred in applying the *Riccobene-Turkette* proof analysis to the allegations in Seville's complaint.
>
> *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786 (3d Cir.1984), *cert. denied* [469 U.S. 1211], 105 S.Ct. 1179 [84 L.Ed.2d 327] (1985).

 In any event, in construing plaintiffs' 1986 complaint liberally as we must, *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), we find that plaintiffs have identified three entities it believed were the enterprises, that General Electric participated in the management of at least one of those enterprises (the Mark II Owners Group), has stated the purposes of both enterprises and has alleged that General Electric shared in the cost of the Mark II owners Group program. At this stage of the proceeding, we conclude that is sufficient.

The gist of defendants' last challenge to plaintiffs' section 1962(a) claim is that the 1986 complaint does not adequately allege that plaintiffs suffered injury "by reason of" its alleged violation of section 1962(a). General Electric correctly maintains that the gist of the offense set forth in section 1962(a) is the use or investment of "racketeering income." Section 1964(c) provides that treble damages are available only to a "person injured in his business or property by reason of a violation of section 1962...." Defendant General Electric maintains that plaintiffs were injured, if at all, when they paid the funds to General Electric pursuant to their contract and not "by reason of" General Electric's subsequent use or investment of the funds. Plaintiffs respond that nothing more is required than an allegation of injury from the commission of the predicate acts of racketeering. Ironically, both parties cite the following portion of *Sedima,* 473 U.S. at 497, 105 S.Ct. at 3286, in support of their positions:

> [T]he compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise.

The starting point in our analysis is section 1962(c), which was the particular section of the RICO statute the Supreme Court in *Sedima* sought to address. The relevant portion of that section provides that "It shall be unlawful for any person ... to conduct or participate ... in the conduct of such enterprise's affairs through a pattern of racketeering activity...." The Supreme Court stated that the damages occuring by reason of a violation of section 1962(c) [conducting an enterprise's affairs through a pattern of racketeering activity] will necessarily flow from the commission of the predicate acts. *Sedima,* 473 U.S. at 497, 105 S.Ct. at 3286. We read defendants' argument to be that the Court in *Sedima,* limiting its discussion to section 1962(c), held that the compensable injury necessarily is the harm caused by the predicate acts because it is impossible to distinguish an injury caused by a violation of section 1962(c) (conducting or participating in an enterprise's affairs) from an injury caused by commission of the predicate acts themselves. Defendant argues that section 1962(a) (which prohibits the use or investment of racketeering income) is a different matter, because the prohibited activity is significantly different from, and independent of, the commission of the underlying predicate acts. It maintains that, in the case of section 1962(a), it is the income, rather than the predicate acts, which is connected with the enterprise and which forms the basis of the violation.

The *Sedima* decision as well as the RICO statute itself, is recent enough to create some uncertainty as to the direction we should take as to section 1962(a). However, defendants argument finds support in the post-*Sedima* case of *Heritage Insurance Company v. First National Bank of Cicero,* 629 F.Supp. 1412, 1417 (N.D.Ill. 1986) in which the Court stated:

> The revised second amended complaint fails to allege how plaintiffs were injured by the Bank's *use* or *investment* of the racketeering income; rather, the injury results from the racketeering activity itself. While such injury is clearly sufficient for RICO standing under § 1962(c), *Haroco, Inc. v. American National Bank & Trust,* 747 F.2d 384 (7th Cir. 1984), *aff'd,* [473] U.S. [606], 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985), plaintiffs cannot recover against the Bank under Count II absent some proximate causation between the § 1962(a) violation and plaintiffs' injury. *See Haroco,* 747 F.2d at 398 ("by reason of" language in § 1964(c) imposes a proximate cause requirement in civil RICO). The complaint as presently alleged gives no indication of how such causation could be plausibly provided. Therefore, the request to dismiss Count II as against the Bank is granted.

■ We agree that even *Sedima* indicates that the injury must be caused by the "conduct constituting the violation," 105 S.Ct. at 3285–86, which for purposes of section 1962(a) is the use or investment of income. Since plaintiffs have failed to give any indication as to how a violation of section 1962(a) caused them injury, that claim is dismissed.

### (5) Sufficiency of Pleading a Violation of § 1962(b)

Section 1962(b) provides:

> It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

Plaintiffs allege that

> GE's wrongful acts constitute a violation of § 1962(b) of RICO because ... in furtherance of GE's schemes to defraud the Owners, GE acquired and maintained an interest in the enterprise comprised of the Owners of the Zimmer project, an enterprise engaged in interstate commerce. GE acquired and maintained an interest in the enterprise made up of the three Owners of the Zimmer project by entering into a contract with them to supply the NSSS system and other services. This interest continued and expanded throughout the Zimmer project because GE received payment under its original contract with the Zimmer Owners and received payment in addition to the original contract amount for work done after the so-called 'new' hydrodynamic loads were disclosed. GE also acquired and maintained an interest in the enterprise made up of the Owners of the Zimmer project because, GE acquired and maintained an inchoate mechanic's lien on the Zimmer project property under Ohio R.C. 1311.02. GE also acquired and maintained an interest in the enterprise made up of the Owners of the Zimmer project in that it advanced its own commercial standing as the supplier of the boiling water NSSS and other services to nuclear plant constructors.

Defendant argues that "General Electric clearly did not acquire an 'interest' in either the Zimmer Owners or the Mark II Owners Groups because the term 'interest' for purposes of § 1962(b) has the limited meaning of a continuing propriety, such as a percentage ownership of a partnership or stock ownership in a corporation." Second, defendant maintains that even if an inchoate mechanics lien on the Zimmer property or "voting rights" in the Mark II Owners Group could constitute an "interest" in an "enterprise," that "interest" must have been obtained "through" a "pattern of racketeering activity" and plaintiffs have alleged no acts showing a causal relationship or nexus between the predicate acts allegedly committed by General Elec-

tric and its "interest" in either the Zimmer Owners or the Mark II Owners Group. Third, defendants argue that plaintiffs' section 1962(b) claim should be dismissed because there is no showing in Count XVII that plaintiffs were injured "by reason of" General Electric's interest in the Mark II Owner's Group or by its inchoate mechanics lien on the Zimmer property.

For its first argument, defendant primarily relies upon two district court cases which do, indeed, limit the definition of "interest" to situations such as a continuing property right in the nature of a partnership or stock ownership. *See United States v. Thevis*, 474 F.Supp. 134, 142 (N.D. Ga.1979), quoting *United States v. Meyers*, 432 F.Supp. 456, 461 (W.D.Pa.1977). However, those cases dealt with the forefeiture provision of RICO, section 1963, rather than the violation provision of section 1962(b) and have since been criticized by the Supreme Court in *Russello v. United States*, 464 U.S. 16, 29, 104 S.Ct. 296, 303, 78 L.Ed.2d 17 (1983) which held that, at least for purposes of the forefeiture provision, section 1963(a)(1), interest includes the proceeds received by defendant pursuant to its schemes. Therefore, we do not find the cases cited by defendant persuasive.

■ Our research reveals that the cases defining "interest" or "control" in the context of section 1962(b) are few in number. In concluding that a leasehold in an enterprise was an interest under section 1962(b), the Second Circuit assumed that the legislative purpose was expressed by the ordinary meaning of the word and referred to the House Report's definition of "interest" as inclusive of "all property and interests, as broadly described, which are related to the violations." *United States v. Jacobson*, 691 F.2d 110 (2d Cir.1982) (citing *United States v. Martino*, 681 F.2d 952 (5th Cir.1982)). In a similar vein, the Seventh Circuit has held that for purposes of section 1962(b), "control within the meaning of the statute need not be formal-need not be the kind of control that is obtained, for example, by acquiring a majority of the stock of a corporation." *Sutliff, Inc. v.*

*Donovan Companies, Inc.*, 727 F.2d 648, 653 (7th Cir.1984). On the other hand, one court addressing section 1962(b) has held that "[t]he mere granting of a license to manufacture ... toys may not be read to confer onto [a person] an 'interest in or control of [an enterprise].' " *Conan Properties, Inc. v. Mattel, Inc.*, 619 F.Supp. 1167, 1172 (S.D.N.Y.1985). Although the law is uncertain, as we read the 1986 complaint, plaintiffs have sufficiently alleged interest and control of the Mark II and Zimmer Owners Groups which constitute the enterprises herein. Plaintiffs allege that General Electric was directly involved in the management of the Mark II Owners Group and held voting rights in it. Further, General Electric shared in the cost of the program and obtained proprietary rights to data, reports and analysis produced by the program. Moreover, it had a multi-million dollar contract with the Zimmer Owners for the construction of a nuclear power plant which was secured by an inchoate lien on the project. Accordingly, we conclude that plaintiffs have sufficiently alleged the elements of "interest" or "control" necessary to support a claim under section 1962(b).

■ We also conclude that plaintiffs have sufficiently alleged that General Electric obtained an interest or control in the Mark II Owners Group and Zimmer Owners "through a pattern of racketeering activity" and that there was a causal connection between that interest or control and plaintiffs' injuries. Section 1962(b) requires a showing of a relationship or nexus between the pattern of racketeering activity and the interest or control obtained. *United States v. Ladmer*, 429 F.Supp. 1231, 1244 (E.D.N.Y.1977). It can be gleaned from the 1986 complaint that General Electric used the Mark II Owners Group and Zimmer Owners as a tool to defraud in the sense that through fraud, it perpetuated an association with the enterprises, and obtained a position where it could induce plaintiffs to enter into costly change orders. Plaintiffs allege that General Electric's interest in the Mark II Owners Group arose out of and was maintained based upon fraudulent assertions that the

Group needed to study "newly-discovered" phenomena and that General Electric would be paid for the work and would have a proprietary right to the data discovered. This is much more than was alleged in *Sutliff, Inc. v. Donovan Companies, Inc.,* 727 F.2d 648, which was held to be sufficient under section 1962(b). Moreover, the implication is that at least some of the injuries sustained by plaintiffs, were caused by that activity. Therefore, under the liberal pleading rules, we hold that plaintiffs' allegations regarding section 1962(b) are sufficient for purposes of a motion to dismiss.

### (6) Sufficiency of Pleading a Violation of § 1962(c)

Section 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

At the outset, the obvious should be stated. The violation proscribed by section 1962(c) is the conducting of affairs or participating in the affairs of an enterprise through a pattern of racketeering activity. Four elements are required to be proved: (1) the existence of an enterprise which affects interstate commerce; (2) that a defendant was employed by or associated with the enterprise; (3) that the defendants participated in the conduct of the enterprise's affairs; and (4) that the participation was through a pattern of racketeering activity. *Sedima,* 473 U.S. at 496, 105 S.Ct.2d 3285. For purposes of section 1962(c), plaintiffs have again alleged two enterprises; the Zimmer Owners and the Mark II Owners Group. Plaintiffs allege that General Electric "participated in the conduct of the enterprise by proposing, directing, rendering advice regarding, investing in and benefitting from the expenditure of funds and the conduct of technical activities and services on behalf of the Zimmer Owners as they pursued their common pur-

pose of constructing and licensing the Zimmer Plant." In regard to the Mark II Owners Group, plaintiffs alleged that General Electric "participated" in the group by serving as a member and technical program manager and shared in the cost of, and gained economic benefit from the program, held voting rights and obtained proprietary rights to data, reports and analysis produced by the program.

Earlier in our Opinion, we determined that both the Zimmer Owners and the Mark II Owners Group are "enterprises" for purposes of RICO and defendant does not appear to dispute that General Electric was "associated with the enterprise[s]." To the contrary their dispute is over the degree of participation in the conduct of the enterprise's affairs that is required and whether General Electric's participation was through a pattern of racketeering activity. Moreover, we are not concerned with whether defendants' participation directly caused the compensable injury, as *Sedima,* 473 U.S. at 497, 105 S.Ct. at 3286, makes clear that under section 1962(c), "[a]ny recoverable damages occurring by reason of a violation of § 1962(c) will flow from the commission of the predicate acts."

█ We conclude that to "participate in the conduct of the enterprise's affairs" means to perform activities necessary or helpful to the operation of the enterprise, whether directly or indirectly. *See United States v. Martino,* 648 F.2d 367 (5th Cir. 1981), *aff'd on other grounds sub nom Russello v. United States,* 464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983). On its face, the statute requires only that the defendant "participated, directly or indirectly in the conduct of [the] enterprise's affairs...." 18 U.S.C. § 1962(c). *Bank of America v. Touche Ross & Co.,* 782 F.2d 966, 970 (11th Cir.1986).

The substantive proscriptions of the RICO statute apply to insiders *and outsiders*—those merely 'associated with' an enterprise—who participate directly *and indirectly* in the enterprise's affairs through a pattern of racketeering activity.... The RICO net is woven tightly to

trap even the smallest fish, those peripherally involved. *Id. citing United States v. Watchmaker,* 761 F.2d 1459, 1476 (11th Cir.1985), *quoting United States v. Elliott,* 571 F.2d 880, 903 (5th Cir.), *cert. denied,* 439 U.S. 953 [99 S.Ct. 349, 58 L.Ed.2d 344] (1978) (emphasis in original).

We recognize that there are cases which also support defendants' position that in order for General Electric to have "particip[d] ... in the conduct" of an "enterprise," it would have had to have been involved in "the operation or management of the business," *see United States v. Mandel,* 591 F.2d 1347, 1375 (4th Cir.1979).[13] However, until this issue is resolved by the Courts, we believe the best view is to look to the precise language of the statute, *Turkette,* 452 U.S. at 580, 101 S.Ct. at 2527. We conclude that the statute fails to impose the requirement of operation or management of the enterprise, and therefore, we reject the more narrow construction. Accordingly, we find plaintiffs' allegations on this issue sufficient.

Defendants also argue that plaintiffs' section 1962(c) claim must fail because there is no sufficient allegation that General Electric "operated" the Mark II Owners Group "through a pattern of racketeering activity." We believe that the test is much broader than defendant states. Rather, the question is more precisely, did General Electric "participate" in the "affairs" of the Mark II Owners Group "through a pattern of racketeering activity?"

The word "through" in the statute requires some proof between the pattern of racketeering activity and the operation of the enterprise. *United States v. Nerone,* 563 F.2d 836, 851 (7th Cir.1977), *cert. denied,* 435 U.S. 951, 98 S.Ct. 1577, 55 L.Ed.2d 801 (1978). It is only when the alleged predicate acts are unrelated to the enterprise or the actor's association with it that the nexus element is missing. *United States v. Provenzano,* 688 F.2d 194, 200 (3d Cir.), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 492, 74 L.Ed.2d 634 (1982). Paragraph 196C alleges that "through its fraudulent acts that constitute a pattern of racketeering activities ... GE participated in the conduct of the Mark II Owners Group and the Zimmer Owners.

Clearly, plaintiffs' voluminous 1986 complaint alleges that the fraudulent acts related to General Electric's association with those enterprises for purposes of establishing the nexus element. When taken as a whole, the complaint alleges that General Electric maintained and continued its association, with, and infiltrated the Mark II Owners Group and Zimmer Owners, through a series of fraudulent representations and omissions which were accomplished by the use of the mails and/or wires. Consequently, the Zimmer Owners and the Mark II Owners Group were used as conduits to further General Electric's fraudulent scheme to deceive others into paying the cost of experimental work concerning nuclear powers. In any event, we conclude that there is a vast difference between proof of a nexus element and the pleading thereof. Therefore, defendants' motion as it relates to section 1962(c) is also denied.

---

**13.** *Compare Bennett v. Berg,* 710 F.2d 1361, 1364 (8th Cir.) (en banc) ("will ordinarily require management or operation"), *cert. denied,* 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983) *and John Peterson Motors, Inc. v. General Motors Corp.,* 613 F.Supp. 887, 900 (D.Minn.1985) ("managerial role"), *with Bank of America National Trust and Savings Ass'n v. Touche Ross & Co.,* 782 F.2d 966, 970 (11th Cir.1986) (not necessary for outside auditor to participate in management; "conduct" means performance of activity necessary or helpful to enterprise); *United States v. De Peri,* 778 F.2d 963, 983 (3d Cir.1985) ("[RICO] draws no distinction between the foot soldier and the general...."); *United States v. Ambrose,* 740 F.2d 505, 512 (7th Cir.1984) (policeman protecting drug dealer), *cert. denied,* 472 U.S. 1017, 105 S.Ct. 3479, 87 L.Ed.2d 614 (1985); *Schacht v. Brown,* 711 F.2d 1343, 1360 (7th Cir.1983) ("[Defendants] argue that § 1962(c) in essence requires that a defendant must be an 'insider' or 'manager' of the damage-causing enterprise in order to suffer liability. We do not believe the language and purpose of § 1962(c) support such an interpretation."), *cert. denied,* 464 U.S. 1002, 104 S.Ct. 509, 78 L.Ed.2d 698 (1983); *and United States v. Martino,* 648 F.2d 367, 382 (5th Cir.1981) (low eschelon participants in arson ring), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982).

## CONCLUSION

Accordingly, it is hereby Ordered that General Electric's motion for judgment on the pleadings (doc. 81) is granted as to Counts III, IV, V, VI, VII, VIII, and IX and denied as to plaintiffs' contract claims, Counts I and II. Further, General Electric's motion to dismiss Counts XVI, except as it relates to plaintiffs' claim under section 1962(a), and Count XVII of the Second Amended Complaint (doc. 202) is denied. Sargent and Lundy's motion for judgment directed against the pleadings (doc. 80) is granted as to Counts XII, XIII, XIV, and XV and is denied as to plaintiffs' contract claims; Counts X and XI.

SO ORDERED.